**SSU FEDERATION OF TEACHERS, LOCAL 4195, AFT, Connie Griffith, Darrell G. Mahoney and The Indiana Education Employment Relations Board, Appellants–Defendants,**

v.

**BOARD OF DIRECTORS, MADISON AREA EDUCATIONAL SPECIAL SERVICES UNIT, Appellee–Plaintiff.**

No. 49A02–9406–CV–348.

Court of Appeals of Indiana.

Oct. 20, 1995.

Barbara J. Baird, Macey, Macey and Swanson, Indianapolis, for Appellant.

Charles R. Rubright, George T. Patton, Jr., Bose McKinney & Evans, Indianapolis, for Appellee.

## OPINION

KIRSCH, Judge.

The Indiana Education Employment Relations Board (Board) determined that the Board of Directors of the Madison Area Educational Special Services Unit (Madison SSU) committed unfair practices against Darrell G. Mahoney (Mahoney) in violation of the Certified Educational Employee Bargaining Act, IC 20–7.5–1–1, *et seq.* (Act). The SSU Federation of Teachers Local 4195, AFT (Federation), Federation president, Connie Griffith (Griffith), and Mahoney (collectively "appellants") appeal the trial court's Judgment reversing that ruling. Appellants raise several issues on appeal which we consolidate and restate as follows:

> Whether the Board's application of an incorrect standard of proof constitutes harmless error when the Board's findings of fact establish that the correct standard was satisfied.

We reverse.

## FACTS

On October 5, 1991, the appellants filed a complaint with the Board concerning alleged discriminatory job transfers against Mahoney by the Madison SSU before the 1990–91 and 1991–92 school years.

The Madison SSU is comprised of six school corporations and two state hospitals covering four counties: Jefferson, Jennings, Switzerland, and Scott. Mahoney has been a teacher with the Madison SSU since 1976. He was also a member of the Federation, which is the exclusive representative of the teachers employed by the Madison SSU.

Since 1985, Mahoney has been the chairperson of the Federation's discussion committee. As chairperson, his duties included bargaining on the Federation's behalf with the chief administrative officer of the Madison SSU, Paul Roahrig (Roahrig). In the discussion meetings during the 1989–90 school year, problems developed between Mahoney and Roahrig which took the form of several heated arguments in the discussion meetings and exchanges of angry letters and memoranda.

Mahoney learned in July 1990, that because of a relocation of most of Madison SSU's students, he was going to be transferred from the Madison Diagnostic Testing Center to the Jennings County Diagnostic Testing Center, which is twenty-four miles away from Mahoney's residence. Mahoney sought a transfer back to a position in the Madison area because he had unexpectedly become exclusively responsible for the care of his two young children. He discussed this with Roahrig and then applied for positions in the Madison area which were much closer to his home. Roahrig denied Mahoney's application, citing a "history of back health problems." *Record* at 31. The Board found this reason to be pretextual and that "Mahoney was denied the MH position because of his activities as the Federation's discussion committee chairperson." *Record* at 31.

After spending the 1990–91 school year in Jennings County, Mahoney again attempted to transfer closer to his home, this time to an open position in Jefferson County. Roahrig awarded the position to someone without ex-

perience and who had not applied for the job. The Board again found that Roahrig's denial of Mahoney's application was "in retaliation for Mahoney's activities as discussion committee chairperson for the Federation." *Record* at 32.

Immediately before the beginning of the 1991–92 school year, Roahrig transferred Mahoney from Jennings County to Switzerland County, which was still twenty-two miles from Mahoney's home. Mahoney's replacement in Jennings County was an unlicensed individual who had been working as a deputy sheriff. The Board concluded, as in the two previous cases, that Mahoney was transferred because of his activities as the Federation's committee chairperson.

Based on Roahrig's actions, the Board concluded that Madison SSU committed unfair practices against Mahoney and ordered Madison SSU to assign Mahoney to a position at Madison Consolidated Schools. Madison SSU timely sought and received judicial review of the Board's Findings of Fact and Conclusions of Law. The trial court reversed the Board's Order and remanded to the Board to conduct further factual findings. The Federation, Mahoney, and Griffith appeal the trial court's judgment.

## STANDARD OF REVIEW

■ When reviewing the decision of an administrative agency, this court stands in the same position as the trial court. *Board of Registration for Land Surveyors v. Bender* (1993), Ind.App., 626 N.E.2d 491, 496. On judicial review, a trial court may grant relief upon finding that the agency's action is: 1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; 2) contrary to constitutional right, power, privilege, or immunity; 3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; 4) without observance of procedure required by law; or 5) unsupported by substantial evidence. IC 4–21.5–5–14 (1988 Ed.); *see also Civil Rights Comm'n v. Delaware County Cir. Ct.* (1994), Ind.App., 642 N.E.2d 541, 545. The reviewing court may not retry the facts and may not substitute its judgment on factual matters for that of the agency. *Burrell v. Lake County Plan Comm'n* (1993), Ind.App., 624 N.E.2d 526, 533. The reviewing court, however, is not bound by the agency's conclusions of law, as law is the province of the judiciary. *Indiana Dep't of Human Services v. Firth* (1992), Ind.App., 590 N.E.2d 154, 156.

## DISCUSSION AND DECISION

■ Appellants contend that the Board's factual findings are sufficient to support its decision. The Board found that Madison SSU's employment decisions involving Mahoney were a pretext for its actual intent to discriminate against him because of his Federation activities. *Record* at 31–33. These factual findings merit the application of what has become known as a "pretext" analysis articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 and *Texas Dep't of Community Affairs v. Burdine* (1981), 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (requiring plaintiff to establish a prima facie case and ultimately persuade the fact finder of the defendant's primary discriminatory intent).

The Board, however, applied what has become known as a "mixed motives" analysis developed by the Court in *Price Waterhouse v. Hopkins* (1989), 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (requiring plaintiff to prove discriminatory motive and then requiring defendant to prove discriminatory motive had no bearing on a negative employment decision). The appellants further contend that even if the Board applied an inappropriate legal standard, here *Price Waterhouse,* that it was harmless error because the factual findings satisfy the plaintiff's more rigorous standard of proof as noted under *Burdine.*

■ *McDonnell Douglas* and *Burdine* apply when the employer's proffered reasons for disparate treatment of the employee are claimed to be merely a pretext for discrimination. Summarizing the *McDonnell Douglas* standard, the Court stated:

"First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the

prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."

*Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94 (citations omitted). The plaintiff's establishment of the prima facie case raises the inference of discrimination. The burden then shifts to the defendant to produce evidence of nondiscriminatory reasons for its actions. The defendant, however, is not required to prove that it was actually motivated by the proffered reasons. It is the plaintiff who carries the ultimate burden of persuading the fact finder that the defendant intentionally discriminated against the plaintiff. *Id.* at 253–55, 101 S.Ct. at 1093–94.

In contrast to the *Burdine* standard, the Court, in *Price Waterhouse v. Hopkins* (1989), 490 U.S. 228, 109 S.Ct. 1775, focused on the combination of an employer's legitimate as well as illegitimate motives for disparate treatment of an employee. The Court stated that "once a plaintiff in a Title VII case shows that gender played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving that it would have made the same decision even if it had not allowed gender to play such a role." *Id.* at 244–45, 109 S.Ct. at 1786–87. In the mixed motives case, the plaintiff need only establish that an illegitimate consideration played a part in the defendant's employment decisions. Once the plaintiff satisfies this burden, the defendant must satisfy its burden of proving that an illegitimate consideration was not a motivating factor. *Id.* at 246, 109 S.Ct. at 1788.

In contrast to the pretext analysis under *McDonnell Douglas* and *Burdine,* where the plaintiff-employee never relinquishes the burden of proving intentional discrimination, the Court in *Price Waterhouse* noted that the defendant-employer's burden is similar to an affirmative defense with the plaintiff persuading the fact finder on one point, and then the defendant, in order to prevail, persuading it on another. *Id.* at 246, 109 S.Ct. at 1788; *see also NLRB v. Transportation Management Corp.* (1983), 462 U.S. 393, 400, 103 S.Ct. 2469, 2473, 76 L.Ed.2d 667.

In the case before us, the hearing officer's findings of fact (which were adopted by the Board) found, in pertinent part, as follows:

"11. There are approximately nine discussion meetings per year between the SSU and the Federation ("the parties"). Mahoney leads the discussion for the Federation, and Paul Roahrig leads the discussion for the SSU.

\* \* \*

"13. Discussion between the parties during 1989–90 was very volatile. Mahoney and Roahrig sent adversarial letters and memoranda to each other relating to discussion procedures and subject matter.

"14. During the 1989–90 school year, problems developed during discussion meetings. There were heated discussions, many of them between Mahoney and Roahrig.

\* \* \*

"17. The SSU stipulated that Mahoney is a very good employee, and the SSU's performance reports and evaluations confirm that he has been a very good employee during his employment with the SSU.

\* \* \*

"21. Mahoney learned in July, 1990, that he was going to be transferred to Jennings County.

"22. After learning of his scheduled transfer, Mahoney applied for a transfer to several other positions located in the Madison area. Mahoney was desirous of remaining in Madison because he had suddenly become responsible for the care of his two children, a situation which he explained to Roahrig. The 24 mile one-way trip to Jennings County adversely affected Mahoney's ability to care for his children.

\* \* \*

"25. On August 10, 1990, Mahoney asked Roahrig if he could be assigned to any

other positions in the Jefferson County area. Madison is in Jefferson County.

"26. Roahrig denied Mahoney's application to teach MH [mentally handicapped] students in the Madison area for the stated reason that Mahoney had a "history of back health problems." In fact, Mahoney had no relevant history of back health problems, and his Jennings County DTC assignment presented more heavy lifting problems than the MH position would have presented. *It is therefore concluded as a fact that Roahrig's stated reason for denying Mahoney's application for the MH position was a pretext. It is inferred from the evidence, considered as a whole, that Mahoney was denied the MH position because of his activities as the Federation's discussion committee chairperson.*

\* \* \*

"28. Roahrig denied Mahoney's application to teach EH [emotionally handicapped] students in the Madison area. Roahrig, on different occasions, stated different and contradictory reasons for his denial of Mahoney's application to teach EH students. *It is therefore concluded as a fact that Roahrig's stated reasons were all pretextual. It is inferred from the evidence, considered as a whole, that Mahoney was denied the EH positions because of his activities as the Federation's discussion committee chairperson.*

\* \* \*

"35. In the summer of 1991, Mahoney applied for a "Supervisor of Low-Incidence" position at the SSU's Southwestern Jefferson location in Hanover. Hanover is nine miles from Madison, in Jefferson County....

\* \* \*

"37. Mahoney was properly licensed for the Southwestern Jefferson position, had experience as a case coordinator, and had operated a business in the Hanover community. Roahrig knew Mahoney desired to be transferred to the Southwestern Jefferson location.

"38. Roahrig awarded the Southwestern Jefferson position to Mary Murray, who had worked only two years for the SSU.

Murray had no case coordinator experience, had not applied for the position, and was beginning her first year as MoMH [Moderate Mentally Handicapped] work transition coordinator at the SSU's Switzerland County location.

"39. The only sensible explanation for the denial of Mahoney's application for the Southwestern Jefferson position, is that the denial was made in retaliation for Mahoney's activities as discussion committee chairperson for the Federation. *It is therefore concluded as a fact that Mahoney was denied transfer to Southwestern Jefferson because of his activities on behalf of the Federation.*

"40. In August, 1991, immediately before the beginning of the 1991–92 school year, Roahrig transferred Mahoney to the Switzerland County MoMH work transition coordinator position being vacated by Mary Murray, as aforesaid.

\* \* \*

"42. Roahrig knew that Mahoney preferred the Jennings County location to the Switzerland County location, which required more travel time from Madison and, consequently, more time away from his children.

"43. Mahoney was replaced at the Jennings County location by an inexperienced, unlicensed person who, at the time, had been working as a deputy sheriff.

"44. *It must be, and is, concluded as a fact that Mahoney was transferred to Switzerland County because of his activities as discussion committee chairperson for the Federation.*"

*Record* at 30–33 (emphasis added). These findings are sufficient to support the pretext analysis of *McDonnell Douglas* and *Burdine* because the trier of fact disbelieved the defendant and the plaintiff established that the defendant's true motive for the adverse employment decisions was discriminatory. *See St. Mary's Honor Center v. Hicks* (1993), 509 U.S. 502, ——, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407, 422. Based on the factual findings, the Board should have applied the pretextual analysis discussed under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93

S.Ct. 1817, and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089.

The hearing officer, however, stated the applicable legal standard (also adopted by the Board) as follows:

"[A] Complainant in a discrimination case must show that an impermissible motive played a motivating part in an adverse employment decision. If a Complainant makes that showing, the Respondent must then show that it would have made the same decision in the absence of an unlawful motive. If the Respondent does make that showing, it will prevail as if it proved an affirmative defense."

*Record* at 33. This is essentially the mixed motives analysis of *Price Waterhouse v. Hopkins,* 490 U.S. at 244, 109 S.Ct. at 1786.

■ The Board's error, however, was harmless because it applied the less stringent mixed motives standard to factual findings that satisfied the more exacting pretext standard. Both the pretext and mixed motives frameworks require the plaintiff to establish discriminatory motive on the defendant's part. The pretext analysis, however, is a more rigorous test because the plaintiff must ultimately prove that the defendant's true motivation behind an adverse employment decision was to intentionally discriminate against the plaintiff.

■ Under the pretext analysis, the defendant need only produce evidence of a valid nondiscriminatory reason behind the plaintiff's adverse treatment and bears no burden of persuasion. On the other hand, under a mixed motives analysis, once the plaintiff shows discrimination was one of several possible factors in an adverse employment decision, the burden of persuasion shifts to the defendant to show discrimination played no part in the employment decision.

■ We do not suggest that the pretext and mixed motives frameworks are identical. In fact, they impose different evidentiary requirements on the parties. *Price Waterhouse,* 490 U.S. at 247, 109 S.Ct. at 1788. When the plaintiff has satisfied the requirements of the pretextual standard, however, the question of whether there were mixed motives becomes moot. By proving pretext, the plaintiff has proven discriminatory intent and the trier of fact has disbelieved the defendant's proffered reasons. At that point, it is unnecessary to consider the question of whether the defendant would have made the same decision without the discriminatory factor because the defendant's true discriminatory motive has been established.

The Court, in *Price Waterhouse,* 490 U.S. at 248 n. 12, 109 S.Ct. at 1788 n. 12, noted the relative difficulty of satisfying either the pretext or mixed motives standard by stating, "If the plaintiff fails to satisfy the fact finder that it is more likely than not that a forbidden characteristic played a part in the employment decision [the mixed motives test], then she may prevail only if she proves, following *Burdine,* that the employer's stated reason for its decision is pretextual." *Id.*

In the case at bar, the hearing officer established factual findings that the negative employment decisions against Mahoney prior to the 1990–91 and 1991–92 school years were based solely on Madison SSU's desire to discriminate against Mahoney as the Federation's chairperson. Moreover, the hearing officer and the Board disbelieved all of Madison SSU's reasons for Mahoney's various transfers, after his initial transfer to Jennings County, and rejections of Mahoney's job applications. Because the Board disbelieved Madison SSU and, further, because Mahoney proved Madison SSU's true discriminatory intent, the question under the mixed motives analysis has already been answered negatively. Thus, the Board's adoption of the mixed motives standard, while error, does not rise to the level of reversible error.

Reversed.

SULLIVAN and FRIEDLANDER, JJ., concur.