### INDIANA FAMILY AND SOCIAL SERVICES ADMINISTRATION, Appellant–Defendant,

v.

### Robert T. PICKETT, Appellee–Plaintiff.

### No. 53A01–0806–CV–297.

Court of Appeals of Indiana.

March 26, 2009.

Rehearing Denied May 26, 2009.

---

Gregory F. Zoeller, Attorney General of Indiana, Frances H. Barrow, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.

Jamie Andree, Indiana Legal Services, Inc., Bloomington, IN, Attorney for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

The Indiana Family and Social Services Administration ("IFSSA") appeals a trial court order that reversed an administrative decision sustaining the denial of Robert Pickett's Medicaid disability application. We affirm.

### Issues

This case presents two intertwined issues concerning the decision of the administrative law judge ("ALJ"). We will address the following restated issues together:

I. Whether the ALJ's findings of fact and conclusions were supported by substantial evidence and, if so, whether the findings and conclusions support the ultimate conclusion that Pickett is not disabled; and

II. Whether the ALJ erred by failing to address relevant medical records regarding Pickett.

### Facts and Procedural History[1]

We include evidence favorable to the ALJ's decision as well as unrefuted evi-

---

1. The pagination in the two-volume appendix is confusing, to say the least. Not only are

dence.[2] On June 9, 2006, Pickett, who had recently lost his Medicaid disability benefits,[3] re-applied for Medicaid disability. App. at 39–42. In his application, he noted his May 2005 approval for Supplemental Security Income ("SSI") benefits, cited his lifelong bi-polar disorder and borderline personality disorder, listed his various medications (some of which he stated he could not afford), outlined some medical history (including dates and facilities), provided no employment history, and indicated that he "cannot get out [of] bed," lift, bend, or do anything. Id.

In October 2006, the Medicaid Medical Review Team ("MMRT") denied Pickett's application. The MMRT provided the following reason: "the social and medical information that was submitted does not confirm that [his] condition substantially impairs [his] ability to perform labor, services, or engage in a useful occupation." Id. at 3. Pickett appealed the MMRT's denial.

On April 20, 2007, an ALJ conducted an evidentiary hearing. Pickett, who was represented by Indiana Legal Services, testified regarding his inability to function. Melissa Cook, the Center for Behavioral Health caseworker who had been working with Pickett, also testified. In a written decision dated May 1, 2007, the ALJ ultimately concluded that Pickett "does not meet the disability requirements for Indiana's Medicaid Program." Vol. I, p. 21. The relevant findings from the ALJ's decision are as follows:

6. [Pickett] is age 39.

7. [Pickett] has the following level of education: 10th grade and has completed his GED.

8. [Pickett's] employment history is limited to working for a few months at a nursing facility and for a couple of fast food restaurants in the local area. [Pickett] currently receives SSI benefits and has not looked for employment since June 2005.

9. [Pickett's] diagnoses are polysubstance abuse, alcoholism, bi-polar disorder, and border-line personality disorder.

10. [Pickett] has been receiving on and off treatment from the Center of Behavioral Health for several years. The only service that he is currently receiving is case management services to help him with money management and to help him get to his various appointments.

---

2. See Walker v. Bowen, 834 F.2d 635, 643 (7th Cir.1987) ("We require the ALJ to discuss specific evidence only if that evidence goes uncontradicted."); Hamilton County Dep't of Pub. Welfare v. Smith, 567 N.E.2d 165, 170 n. 2 (Ind.Ct.App.1991) (disability case noting that federal decisions interpreting statutes with similar language and purpose as a state statute "may aid us in construing the state statute.").

3. Incomplete paperwork seems to have led to the March 2006 discontinuation of Pickett's Medicaid disability benefits. Vol. I, p. 15–16, 29. According to Pickett, he was too depressed to appeal the loss. A caseworker from the Center for Behavioral Health ("CBH") began managing his money in April 2006.

there multiple page numbers on various parts of the bottoms of pages, but the pagination appears to begin anew at one point. To be clear, when referring to any of the first twenty-three pages within Volume I, we shall use the notation: "Vol. I, p.——." When referring to any of the pages beyond twenty-three (when a new numbering system seems to begin and uses several zeros before the numeral), we shall use the notation: "App. at ——." Further, we note that the appendix contains various duplicate forms and records and does not appear to be in chronological order or any other order. If the ALJ was presented with a similar record, we can easily understand how crucial evidence may have been missed.

11. [Pickett] requested in February 2006 that full responsibility for his funds be turned back over to him and that the Center for Mental Health no longer act as his protective payee. The notes verify [Pickett] was not attending scheduled counseling appointments, that he was not properly taking medications, and that he was probably using again.

12. The progress notes from the Center for Mental Health counselor documents that after being [Pickett's] counselor for three years, the counselor has come to the conclusion [Pickett] has been making up stories concerning family crises in order to manipulate the counselor and other health care providers into giving him what he wanted.

13. [Pickett's] psychiatrist discontinued [Pickett] from Xanax and Seroquel in July 2006.

14. The most recent psychiatric progress note of July 18, 2006 verifies [Pickett] was is [sic] not suicidal, his thought process is logical, sequential, and goal directed. His main concern was that his Xanax had been discontinued.

15. The evidence does not document any physical limitations in [Pickett's] activities.

*Id.* at 18–19.

The ALJ's conclusions are as follows:

[A.] [Pickett's] age cannot be considered a significant factor in determining his ability to engage in or adapt to a useful occupation as the state regulation only allows age to be considered a significant factor if the individual is over age fifty-five (55).

[B.] The medical evidence does not document any physical limitations in [Pickett's] activities.

[C] The medical evidence from [Pickett's] mental health treatment center documents that [Pickett] is not suicidal or homicidal, his thought content is appropriate and is also logical, sequential, and goal directed. There is no evidence of psychosis.

[D.] The evidence does not support that [Pickett's] documented condition substantially impairs his ability to perform labor, services, or engage in a useful occupation.

*Id.* at 20–21 (letters inserted for ease of reference).

Pickett, through Indiana Legal Services, requested review of the ALJ's decision. App. at 327–28. On May 22, 2007, IFSSA issued a "Notice of Final Agency Action," correcting a typographical error[4] and affirming the ALJ's decision to deny Medicaid. Vol. I, p. 23.

On June 7, 2007, Pickett filed a petition for judicial review of the administrative agency's decision. *Id.* at 14. IFSSA filed a brief in opposition; Pickett, in turn, filed a reply. On April 18, 2008, the Monroe Circuit Court heard oral argument by counsel for both parties. The court requested and received proposed findings. On May 29, 2008, the court issued a written order reversing the final decision of the agency. *Id.* at 7–13. The twenty-eight findings and conclusions within the court's decision explain why Pickett qualifies for Medicaid disability.

IFSSA appeals. Further facts shall be supplied where relevant.

---

4. Toward the end of the ALJ's six-page decision, the following sentence appears: "The Administrative Law Judge [ ] the denial of Medical Assistance to the Disabled to Robert Pickett." Vol. I, p. 21. The IFSSA changed the sentence by inserting "sustains" where we have placed the empty brackets. *Id.* at 23.

## Discussion and Decision

■ "When reviewing the decision of an administrative agency, this court stands in the same position as the trial court." *SSU Fed'n of Teachers v. Bd. of Dirs., Madison Area Educ. Sec. Servs. Unit,* 656 N.E.2d 832, 835 (Ind.Ct.App.1995); *Sanders v. State Family & Soc. Servs. Admin.,* 696 N.E.2d 69, 70 (Ind.Ct.App.1998). While we may not reweigh the evidence or judge the credibility of witnesses, an agency's conclusions of law are well within our province. *Lazzell v. Ind. Family & Soc. Servs. Admin.,* 775 N.E.2d 1113, 1115 (Ind.Ct. App.2002). Thus, an agency's decision may be vacated if the evidence, viewed in the aggregate, demonstrates that the conclusions reached by the agency are clearly erroneous. *Partlow v. Ind. Family & Soc. Servs. Admin.,* 717 N.E.2d 1212, 1214 (Ind. Ct.App.1999).

The Administrative Orders and Procedures Act outlines judicial review as follows:

> The court shall grant relief ... only if it determines that a person seeking judicial relief has been prejudiced by an agency action that is:
>
> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (2) contrary to constitutional right, power, privilege, or immunity;
>
> (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (4) without observance of procedure required by law; or
>
> (5) *unsupported by substantial evidence.*

Ind.Code § 4–21.5–5–14(d) (emphasis added); *Huffman v. Office of Envtl. Adjudication,* 811 N.E.2d 806, 809 (Ind.2004). The party asserting invalidity of an agency action shoulders the burden of demonstrating that the agency's decision was unsupported by substantial evidence, procedurally deficient, arbitrary, capricious, or violative of constitutional, statutory, or legal principles. Ind.Code § 4–21.5–5–14(a).

In appealing IFSSA's denial of Medicaid, Pickett contended, and the trial court agreed, that the ALJ failed to base her conclusion on substantial evidence. Pickett also successfully argued to the trial court that the ALJ erred as a matter of law in failing to address opinions of medical professionals that describe how Pickett's mental conditions impair his ability to perform labor or services or to engage in a useful occupation.

Disagreeing with the trial court and Pickett, IFSSA stresses that "[i]t is the ALJ, not a physician, who makes the legal determination whether an applicant is disabled." Appellant's Br. at 10. IFSSA also asserts that the ALJ did not have to mention every piece of evidence in her decision, and that just because certain evidence was not noted does not mean it was not considered. *Id.* at 9. Relying on the following language from the ALJ's decision, IFSSA maintains that the ALJ actually did consider each piece of evidence:

> The Administrative Law Judge has carefully reviewed the testimony presented at the hearing, all evidence, Federal/State regulations, and policy transmittals in regard to this matter. The Decision, which follows, outlines the facts and conclusions therefrom that are the basis for the final determination by the Administrative Law Judge....
>
> Based upon the testimony and evidence submitted at the hearing the Administrative Law Judge concludes:....

Vol. I, p. 17, 20.[5] Further, IFSSA contends that the ALJ's decision was supported by substantial evidence.

---

5. We briefly address the notion that this language, inserted on the cover page of the ALJ's

 This case requires us to examine applicable statutes and administrative code provisions. In doing so, we recall that the rules of statutory construction are applicable to the interpretation of administrative regulations. *U.S. Outdoor Adver. Co. v. Ind. Dept. of Transp.*, 714 N.E.2d 1244, 1256 (Ind.Ct.App.1999), *trans. denied.* In construing a statute or administrative regulation, courts must begin with the express language of the statute or regulation itself. *Partlow*, 717 N.E.2d at 1214–15. Words must be given their plain and ordinary meaning. *Id.* We determine, give effect to, and implement the legislative intent or purpose underlying the statute. *Bushong v. Williamson*, 790 N.E.2d 467, 471 (Ind. 2003). We construe the statute in such a way as to prevent absurdity and hardship and to favor public convenience, and we consider the repercussions of interpretations. *Id.*

 Title XIX of the Social Security Act ("SSA"), commonly called "Medicaid," was enacted by the Social Security Amendments of 1965, Pub.L. No. 89–97. *Sullivan v. Day*, 681 N.E.2d 713, 715 (Ind. 1997). Medicaid's purpose is to furnish medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and rehabilitative and other services to help such families and individuals attain or retain capability for independence or self-care. 42 U.S.C. § 1396; *Andrianova v. Ind. Family & Soc. Servs. Admin.*, 799 N.E.2d 5, 8 (Ind.Ct.App.2003). The program operates through a combined scheme of federal and state statutory and regulatory authority.

*See Curtis v. Roob*, 891 N.E.2d 577, 579 (Ind.Ct.App.2008). If a state opts in to the cost-sharing program, as Indiana has, it is bound by the program's requirements. *Id.*

The requirements for an ALJ's decision are as follows:

(a) Following the completion of the hearing, or after the submission of briefs by the parties (if briefing is permitted by the ALJ), the administrative law judge shall issue his or her decision in the matter concurrently to the parties. The decision shall be final unless a party requests agency review of the decision in accordance with 405 IAC 1.1–2.

(b) The ALJ's decision shall:

(1) include findings of fact;

(2) specify the reasons for the decision; and

(3) identify the evidence and statutes, regulations, rules, and policies supporting the decision.

(c) *The findings of fact need not include a recitation of every piece of evidence admitted in the evidentiary hearing.* Rather, the findings should contain the basic facts that have formed the basis for the ALJ's ultimate decision. The decision must demonstrate a rational connection between the basic facts found by the ALJ and the ALJ's ultimate decision. The ALJ's decision must also cite the relevant laws upon which the ultimate decision is based, and relate the facts to the law.

405 IAC 1.1–1–6 (emphasis added).

 Thus, while there is no requirement that the ALJ cite each and every piece of evidence presented, the ALJ's

decision and immediately prior to the conclusions of law, could insulate an administrative decision from any evidentiary challenge. This simply cannot be, as this would eliminate meaningful review no matter how much, if any, evidence was considered. *See Ind. Alcoholic Beverage Comm'n v. River Road Lounge, Inc.*, 590 N.E.2d 656, 659 (Ind.Ct.App.1992) (noting that the "court will not simply rubber stamp the agency's decision without critically reviewing the evidence as a whole."), *trans. denied.*

"decision must demonstrate a *rational connection* between the basic facts found by the ALJ and the ALJ's ultimate decision" and must "relate the facts to the law." 405 IAC 1.1–1–6(c) (emphasis added). Moreover, the agency action, here the denial of benefits, must be supported by "substantial evidence." Ind.Code § 4–21.5–5–14(d)(5); *see also Ind. Civil Rights Comm'n v. Wellington Vill. Apts.*, 594 N.E.2d 518, 529, 531 (Ind.Ct.App.1992) (noting that if agency's findings have a "reasonably sound basis of evidentiary support based on a review of the record in its entirety," then the court is "obligated to uphold the agency's decision"; and concluding that commission's finding was "not supported by substantial evidence"), *trans. denied.* "[S]ubstantial evidence is more than speculation and conjecture" yet less than a preponderance of evidence. *River Road Lounge, Inc.*, 590 N.E.2d at 659. Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

We now turn to the pertinent Indiana statute, which states that Medicaid assistance "shall be given to a needy individual with a disability who meets the following qualifications":

(1) Has a pending application on file with the federal Social Security Administration for assistance under Public Law 92–603, supplemental security income (SSI), or *is receiving assistance.* However, a person whose application for assistance under Public Law 92–603 has been denied but who meets all other requirements of this chapter is eligible for supplemental assistance.

(2) Has one (1) of the following:

(A) A physical or mental impairment, disease, or loss that is verifiable by a physician licensed under IC 25–22.5, that appears reasonably certain to result

in death or to last for a continuous period of at least twelve (12) months without significant improvement, and that substantially impairs the individual's ability to perform labor or services or to engage in a useful occupation.

(B) *A mental impairment, disease, or loss that is:*

(i) *diagnosed* by a physician licensed under IC 25–22.5 or a health services provider in psychology licensed under IC 25–33–1; and

(ii) *verifiable* by a physician licensed under IC 25–22.5 or a psychologist licensed under IC 25–33;

that appears *reasonably certain to last for a continuous period of at least twelve (12) months without significant improvement, and that substantially impairs the individual's ability to perform labor or services or to engage in a useful occupation.* Employment in a sheltered workshop or under an approved vocational rehabilitation plan is not considered a useful occupation for the purposes of this chapter. The determination of medical disability under this subdivision shall be made without reference to the individual's ability to pay for treatment. . . .

Ind.Code § 12–14–15–1 (emphases added). Of note, Indiana Code Section 12–14–15–1 does not require a finding that the applicant is *unable* to join the workforce; rather, the statute refers to a *substantial impairment* in the applicant's ability to be a part of that workforce. *See Moore v. Ind. Family & Soc. Servs. Admin.*, 682 N.E.2d 545, 548 (Ind.Ct.App.1997).

The Indiana Administrative Code fleshes out principles and considerations for a determination of disability as follows:

(1) The determination of whether a condition appears reasonably certain . . . to last for a continuous period of at least twelve (12) months without significant

improvement is made on the basis of the expected duration of the condition. . . . .

(2) The determination of whether a condition *substantially impairs* the applicant's ability to perform labor or services or to engage in a useful occupation *will be made based upon a consideration of the following:*

(A) The applicant's functional limitations, as follows:

(i) Consideration is given to the applicant's significant physical functions and capacity that affect vocational capacity, such as standing, walking, lifting, range of motion, strength, agility, and stamina.

(ii) *Consideration is given to the individual's intellectual and sensory functions that affect vocational capacity, such as* sight, speech, hearing, *reasoning, and following directions.*

(iii) *Consideration is given to the applicant's capacity for sustained activity on a regular basis.*

(B) The applicant's age, as follows:

(i) An individual who is not engaged in a useful occupation solely because of age cannot be found disabled if the individual's impairment, education, and work experience would enable the individual to function in a useful capacity.

(ii) If the applicant is over fifty-five (55) years of age, . . . .

(iii) If the applicant is under eighteen (18) years of age, . . . .

(iv) A condition that is likely to substantially impair a child's ability to become an independent and self-supporting adult is a basis for a finding of disability.

(C) The applicant's education and training, as follows:

(i) Consideration is given to the applicant's *formal schooling and other training* that contributes to the applicant's ability to meet vocational requirements.

(ii) Past work experience, daily activities, and hobbies are considered in determining and evaluating skills not acquired in a formal setting.

(iii) *In determining whether these factors are vocationally significant, consideration is given to the time elapsed since the completion of education, training, or the exercise of acquired skills.*

(iv) Lack of education and training is not of itself a basis for a finding of disability.

(D) The applicant's work experience, as follows:

(i) The applicant's inability to engage in the applicant's former occupation is not, in itself, a basis for a finding of disability.

(ii) Work performed fifteen (15) or more years before an application is not considered vocationally relevant. *Similarly, an individual who has no work experience or only sporadic work experience in the previous fifteen (15) years is considered to have no work experience relevant to the determination of disability.*

(iii) The absence of work experience is not in itself a basis for a finding of disability.

(iv) If an applicant is physically or mentally unable to engage in any previous occupation but the applicant's remaining functional capacity and vocational capabilities are sufficient to meet the demands and adjustments required by a different occupation, the applicant is not considered disabled.

405 IAC 2–2–3(a) (emphases added).

As we look closely at the ALJ's findings and conclusions, we keep in mind

that there is no dispute regarding Pickett's diagnosis of multiple mental impairments/diseases. Similarly, there is no argument about the verifiability or continuous [6] nature of Pickett's bi-polar disorder, borderline personality disorder, polysubstance abuse, or alcoholism. Rather, in reviewing the ALJ's ultimate decision that Pickett does not meet the disability requirements for Indiana's Medicaid program, we ask whether there is a rational connection between the basic facts found by the ALJ and the ALJ's ultimate conclusion, and whether such conclusion is based on applicable law. Stated more narrowly, is there substantial evidence to support the conclusion that Pickett's mental impairments do not substantially impair his ability to perform labor or services or to engage in a useful occupation?

Findings # 1 through # 5 note the procedural steps taken in Pickett's Medicaid case. Finding # 6, which notes Pickett's age, does not cut in favor of or against the conclusion that Pickett's mental disorders substantially impair his ability to perform labor or services or engage in a useful occupation. *See* 405 IAC 2–2–3(a)(2)(B). Indeed, the ALJ concludes as much in Conclusion B. As for Finding # 7, which notes Pickett's 10th grade/GED education, the Administrative Code states that in determining whether this factor is "vocationally significant, *consideration is given* to the time elapsed since the completion of education[.]" 405 IAC 2–2–3(a)(2)(C) (emphasis added). The ALJ makes no finding regarding when Pickett earned his GED, and there is no mention of any additional training. Thus, this finding is of little assistance.

Finding # 8 describes Pickett's employment history as "limited to a few months at a nursing facility" and "for a couple of fast food restaurants." An exhibit introduced at the ALJ hearing confirms that in Pickett's thirty-nine years, he has worked for seven different employers for a total of approximately eighteen months. App. at 255 (Exh. 5). This would seem to epitomize "sporadic work experience in the previous fifteen years," and therefore Pickett would "have no work experience relevant to the determination of disability." 405 IAC 2–2–3(a)(2)(D). Finding # 8 also notes that Pickett "receives SSI benefits," which proves that Pickett meets the requirement of Indiana Code Section 12–14–15–1(1). This is supported by Pickett's testimony that he has been receiving $625.00 per month in SSI since November 2005. App. at 14–15.

Finding # 9 lists Pickett's various diagnoses, thus showing that he meets the requirement of Indiana Code Section 12–14–15–1(2)(B). However, the ALJ includes no evidence, and makes no finding, regarding whether or how Pickett's bi-polar disorder, borderline personality disorder, polysubstance abuse, or alcoholism substantially impair his ability to perform labor or services or to engage in a useful occupation.

As for Finding # 10, Pickett's inconsistent treatment with CBH over several years neither supports nor disproves the conclusion that Pickett's mental illnesses and substance problems do not substantially impair his ability to perform labor or services or engage in a useful occupation. The second part of Finding # 10, that

---

6. Born in 1967, Pickett was first treated for mental health problems in early elementary school, has had numerous hospitalizations for psychiatric reasons including suicidal ideation, has received consistent multiple diagnoses from various medical professionals, no longer drives, struggles with everyday tasks, and has not lived independently. Given this history, we can see why the verifiable and continuous elements are not disputed.

Pickett is currently receiving *only* services for money management and help to attend appointments, is not only inaccurate but also misleading to the extent that it implies Pickett is independently functioning. The most recent, unrefuted evidence regarding services provided to Pickett was presented via CBH caseworker Cook at the April 20, 2007 hearing. Cook testified that she had been managing Pickett's money since April 2006 and been working with him individually on life skills since September 2006. Specifically, Cook would ensure that Pickett ate, taking him shopping with his food stamps and supplementing at food banks when the stamps ran out. App. at 31. In addition, she would help Pickett keep track of appointments, drive him to his appointments, transport him to the pharmacy, and remind him to get medication samples. *Id.* at 31–32. Cook assisted Pickett in completing forms and ensured that he would not lose his SSI benefits. She counseled him on coping skills, appropriate behavior, decision-making, relationships, and emergency plans. When asked why Pickett required a case manager, Cook testified:

> *He's really not able to kind of manage his life on his own right now.* For the months that I was only managing his money, I had never even met him. I would just pay his bills and then leave a check for him to pick up at CBH, and that was around the time that he lost his

Medicaid. I decided that it would probably be good for me to follow up with him. And he was not eating. *He hadn't had his medications,*[7] *because he lost his Medicaid.* He was just completely destitute. I mean he was not able to do much of anything on his own.

*Id.* at 32 (emphases added).[8] The suggestion that Pickett was receiving minimal services is not supported by substantial evidence.

Finding # 11 is accurate in that Pickett did request that he, rather than CBH, control his funds. What Finding # 11 fails to state is that CBH did not grant Pickett's request. While this denial might imply CBH's belief that Pickett was incapable of handling his own financial responsibilities, there could be an equally plausible different reason for CBH's denial. However, the evidence is unclear, and without more information, Pickett's request neither supports nor refutes the ultimate conclusion. As for the rest of Finding # 11, which states that Pickett was not attending scheduled counseling appointments, not taking medications, and "probably using," these behaviors are consistent with his diagnoses [9] and with the fact that Pickett stopped receiving Medicaid in March 2006. Regardless, none of the behaviors noted in Finding # 11 support or contradict the conclusion that Pickett's mental illnesses and substance abuse

7. Past psychiatric medications include: Trileptal, Lexapro, Xanax, Depakote, Seroquel, Remeron, Wellbutrin, Clonopin, Zoloft, Prozac, Paxil, Lithium, and Tegretol. App. at 157 (CBH notes from August 24, 2005), 254 (Exh. 4).

8. Bathing and maintaining his home were other problem areas for Pickett. App. at 32–33.

9. *See* App. at 229 (Bloomington Hospital record noting that Pickett's insight and judgment are consistent with severe personality disor-

der); *see also id.* at 217 (Bloomington Hospital record stating that Pickett's insight is "essentially nil."); *see Commitment of M.M. v. Clarian Health Partners,* 826 N.E.2d 90, 96–97 (Ind.Ct.App.2005) (discussing how refusal to take medication, lack of insight, and poor judgment are consistent with bi-polar disorder), *trans. denied; see also* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 197–99(4th ed. 1994) ("DSM–IV–TR") (discussing how substance abusers continue to use despite knowledge of problems).

problems do not substantially impair his ability to perform labor or services or engage in a useful occupation.

Finding # 12, which highlights a CBH caseworker's impression that Pickett has been making up stories to manipulate others to give him what he wants, seems to have originated from a June 16, 2006 CBH progress note. In this note, which was ten months old by the time of the hearing with the ALJ, the caseworker also recommended that Pickett continue Trileptal and Xanax, start Seroquel, and return in one month. *Id.* at 139. The manipulative behavior (and the medication recommendations), while perfectly consistent with Pickett's mental disorders,[10] does not speak to the ultimate question of whether his illnesses substantially impair his ability to perform labor or services or engage in a useful occupation.

Finding # 13 states that Pickett's psychiatrist discontinued him from Xanax and Seroquel. It is difficult to discern whether this is accurate and, if so, the reason for the discontinuation. The Appendix contains a July 13, 2006 CBH progress note which states that Pickett was very upset when told he could not have any more Xanax. *Id.* at 137. Yet, the same note includes a recommendation that Pickett "[c]ontinue medications as found in the Rx profile. Return to the clinic in one month." *Id.* The CBH progress note immediately preceding the July 13, 2006 note is the June 16, 2006 note, which recom-

mended that Pickett continue Trileptal and Xanax and start Seroquel. *Id.* at 139. The CBH progress note immediately *after* the July 13, 2006 note is one dated July 18, 2006, which recommends that Pickett start Trazedone and continue with Xanax. *Id.* at 135. It is entirely possible that Pickett was told he could not have certain medications because he no longer had Medicaid to pay for them. Indeed, this would be consistent with a March 31, 2006 CBH progress note that recommended that Pickett "start Seroquel ... from sample stock" and with Cook's testimony that Pickett lost his Medicaid in March 2006. *Id.* at 144. However, without substantial evidence to support this finding, let alone any indication why certain medication might have been discontinued, Finding # 13 does not support any conclusion about how Pickett's mental illnesses and substance abuse problems may affect his ability to perform labor or services or engage in a useful occupation.

We quote Finding # 14 verbatim: "The most recent psychiatric progress note of July 18, 2006 verifies the appellant was is not suicidal, his thought process is logical, sequential, and goal directed. His main concern was that his Xanax had been discontinued." Ignoring the "was is" problem, we note that this information was gleaned from two lines on one page [11] of the two-volume Appendix. *Id.* at 135. Further, the information in Finding # 14 appears to

---

10. *See* DSM–IV–TR at 710 (noting that borderline personality disorder is characterized by, *inter alia*, manipulative behavior).

11. Interestingly, the very same July 18, 2006 CBH note from which those two lines were found, contains the caseworker's observations from that day that Pickett was "trying" to regain his Medicaid; he "looked completely disheveled;" and his "primary complaint is that he has been up 3 days." App. at 135. Finding # 14 does not mention these observa-

tions. Also recorded in that same July 18, 2006 note but absent from Finding # 14, is the caseworker's assessment that Pickett's hair was greasy, his clothes were dirty, his mood was angry, and his affect was constricted. *Id.* Likewise, Finding # 14 omits any reference to the caseworker's recommendations in the July 18, 2006 note, which were that Pickett start Trazedone, continue Xanax, and return to the clinic the following week. *Id.*

have been expanded and used as the basis for Conclusion C ("The medical evidence from [Pickett's] mental health treatment center documents that [Pickett] is not suicidal or homicidal, his thought content is appropriate and is also logical, sequential, and goal directed. There is no evidence of psychosis."). Having reviewed the Appendix provided, we question the accuracy of the "no evidence of psychosis" [12] conclusion. Yet, even if one could infer "no evidence of *psychosis*" from the selected quotes of a caseworker made on one day, nine months prior to the hearing with the ALJ, psychosis is not the mental impairment at issue. Thus, lack of psychosis has no bearing on whether Pickett's particular diagnosed and verifiable illnesses (bi-polar disorder, borderline personality disorder, polysubstance abuse, and alcoholism) substantially impair his ability to perform labor or services or to engage in a useful occupation.

Finding # 15, which states that the evidence does not document any physical limitations in Pickett's activities, is almost identical to Conclusion B. Physical functions, such as standing, walking, lifting, range of motion, strength, agility, and stamina certainly affect vocational capacity. *See* 405 IAC 2–2–3(a)(2)(A)(i). However, Pickett's *physical* functions and capacity are not at issue. Rather, the key considerations in determining Pickett's functional limitations are his "intellectual and sensory functions that affect vocational capacity," such as "reasoning, and following directions" (405 IAC 2–2–3(a)(2)(A)(ii)) and his "capacity for sustained activity [e.g., work] on a regular basis" (405 IAC 2–2–3(a)(2)(A)(iii)).

Oddly, none of the ALJ's findings or conclusions address Pickett's capacity for sustained activity on a regular basis, or discuss whether his intellectual or sensory functions affect his vocational capacity, or concern whether he has the necessary reasoning and direction-following abilities to perform labor/services. This is surprising because evidence, findings, and/or conclusions pertaining to these matters would certainly constitute substantial evidence of whether Pickett's mental disorders substantially impair his ability to perform labor or services or to engage in a useful occupation, which in turn would support a decision regarding Pickett's eligibility/non-eligibility for Medicaid. If no evidence on these questions had been presented, the absence of findings/conclusions would be rational because there would be no facts to apply to the law regarding functional limitations. However, that is not the case. Our review of the Appendix reveals that evidence was submitted regarding whether Pickett's verifiable and continuous bi-polar disorder, borderline personality disorder, polysubstance abuse, or alcoholism affect his intellectual and sensory functions for vocational purposes, his ability to reason and follow directions, and/or his capacity for sustained activity (such as work) on a regular basis. As outlined below, the evidence uniformly supports the conclusion that Pickett's documented conditions sub-

---

12. Psychosis has been defined as "[a] severe mental disorder ... characterized by derangement of personality and loss of contact with reality and causing deterioration of normal social functioning." *Ankney v. State*, 825 N.E.2d 965, 977 (Ind.Ct.App.2005) (citing The American Heritage Dictionary 1462 (3d ed.1992)), *trans. denied;* Merriam-Webster's On-Line Dictionary (visited Mar. 11, 2009) (defining psychosis as "fundamental derangement of the mind (as in schizophrenia) characterized by defective or lost contact with reality especially as evidenced by delusions, hallucinations, and disorganized speech or behavior"). Notations to delusions, confusion, illogical thinking, etc. within Pickett's mental health treatment center documents belie the "no evidence of psychosis" conclusion. *See*, e.g., App. at 144, 155, 107, 117.

stantially impair his ability to perform labor, services, or engage in a useful occupation.

First, the most recent CBH treatment plan recommended thirty-five hours of intervention services (case management, life skills training, medication monitoring) *per week* to assist Pickett. App. at 131 (Feb. 23, 2007 plan). That same plan described Pickett's "Health Practice" as "*extremely severe impairment or problems in functioning; pervasive level of supports needed.*" *Id.* at 132 (emphasis added). In addition, the plan noted "moderate impairment/problems in functioning" under the areas of community resources, coping skills, productivity, and nutrition. *Id.* at 131–34. In the areas of managing money and time, Pickett was classified as "severe impairment" and "moderately severe impairment" respectively. *Id.* at 133.

Second, a "psychiatric review" by Kenneth Neville, Ph.D./KGN, noted Pickett's affective disorders (specifically "[b]i-polar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes"), anxiety-related disorders, and personality disorders. *Id.* at 186, 189 (Sept.2005). That same evaluation cited Pickett's "[i]nflexible and maladaptive personality traits which cause either *significant impairment in* social or *occupational functioning* or subjective distress, as evidenced by … [i]ntense and unstable interpersonal relationships and impulsive and damaging behavior.'" *Id.* at 193 (emphases added). That evaluation also contained a section entitled "Rating of Functional Limitations," which specified the degree (none, mild, moderate, marked, extreme, or insufficient evidence) of limitation to a particular functional criterion.

*Id.* at 196. A "marked" limitation is one that "interferes seriously with [the applicant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.00C. Pickett's mental disorders left him with "marked" limitation in the following areas: "Restriction of Activities of Daily Living," "Difficulties in Maintaining Social Functioning," and "*Difficulties in Maintaining Concentration, Persistence, or Pace.*" *Id.* (emphasis added). Dr. Neville also noted that Pickett was on numerous psychotropic medications and had a history of decompensations. He described Pickett as impulsive, irresponsible, dramatic, and emotionally labile. Further, Dr. Neville indicated that Pickett vacillates between depression and mania, requires reminders for self-care, and "*completes few tasks.*" *Id.* at 198 (emphasis added). The marked limitations and other details outlined by Dr. Neville supported Pickett's successful application for SSI disability.[13]

Third, Richard Winn, Psy.D., HSPP, conducted a mental status examination of Pickett. In the resulting report, Dr. Winn summarized Pickett as follows:

> The claimant's coping ability appears overwhelmed. His skill deficits include lack of self-care when he is depressed, poor interpersonal relationships, especially in the adult peer settings of a work environment. He has poor self-control related to his mood and affective instability. His decision-making is impulsive at times. … The claimant is not socially mature. By the nature of his pathology, he is irresponsible.
>
> . . . .

---

13. Again, we note that federal law may offer guidance in the state arena when, as here, similar purposes are involved.

The claimant's mood ability is consistent with a Bipolar I disorder. He varies between episodes of going without sleep, feelings of euphoria with self-defeating behaviors (e.g., spending money on credit that he does not have), and profoundly depressed episodes. His reported episodes of anxiety generally appear in adult interpersonal settings. These episodes include symptoms of panic and social phobia (avoidance of these situations and dread of being [in] these situations).

*Id.* at 202. Dr. Winn then confirmed the diagnoses of bi-polar disorder and borderline personality disorder and opined that if awarded disability benefits, Pickett "could not manage them adequately in his own best interests due to episodes of hypermania." [14] *Id.* at 203. Furthermore, Dr. Winn stated that without treatment, Pickett's prognosis was "poor," and that even with treatment, Pickett's prognosis was "guarded." *Id.*

In sum, the only evidence that actually addresses Pickett's capacity for sustained activity on a regular basis, his intellectual or sensory functions as they relate to his vocational capacity, and/or his ability to perform necessary reasoning and direction-following, paints the same picture of substantial functional limitation. *See* 405 IAC 2–2–3(a)(2)(A). Moreover, these substantial functional limitations, combined with Pickett's limited education and vocationally irrelevant sporadic employment history clearly show that Pickett's multiple mental impairments substantially impair his ability to perform labor or services or to engage in a useful occupation. 405 IAC 2–2–3(a)(2). That showing, plus the undisputed, continuous, verifiable nature of Pickett's bi-polar disorder, borderline personality disorder, polysubstance abuse, and alcoholism, plus the fact that Pickett receives SSI, leads to the inescapable conclusion that he is eligible for Medicaid disability. Ind.Code § 12–14–15–1. Accordingly, the ALJ's decision to the contrary was unsupported by substantial evidence. The administrative decision did not demonstrate a rational connection between the facts found and the applicable law. As set out *supra,* the findings neither supported nor contradicted the conclusion that Pickett's mental illnesses and substance abuse problems do not substantially impair his ability to perform labor or services or engage in a useful occupation. The only evidence that touched on this central question refuted the conclusion reached by the ALJ.[15] Therefore, we affirm the trial court's reinstatement of Pickett's Medicaid disability benefits.

Affirmed.

ROBB, J., and BROWN, J., concur.

---

**14.** Unfortunately, Dr. Winn was on target in that Pickett has been unable to manage his finances.

**15.** In reaching this conclusion, we by no means imply that one or more medical opinions automatically trump an ALJ's opinion. Rather, we stress that evidence (medical or otherwise) that actually addresses the relevant legal question must be considered at the administrative level.