FILED

Apr 26 2017, 9:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



| ATTORNEYS FOR APPELLANT | ATTORNEY FOR APPELLEE |
|---|---|
| Curtis T. Hill, Jr.<br>Attorney General of Indiana | Steven T. Fulk<br>Fulk & Associates, LLC<br>Indianapolis, Indiana |
| Frances Barrow<br>Kyle Hunter<br>Deputy Attorneys General<br>Indianapolis, Indiana | |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| State of Indiana, Indiana Department of Correction, and Indiana State Employees' Appeals Commission,<br><br>*Appellants-Respondents,*<br><br>v.<br><br>Debra Mills, *et al.*,<br><br>*Appellees-Petitioners.* | April 26, 2017<br><br>Court of Appeals Case No. 49A02-1605-PL-998<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Thomas J. Carroll, Judge<br><br>Trial Court Cause No. 49D06-1407-PL-25580 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellants-Respondents, State of Indiana (State), Indiana Department of Correction (DOC), and Indiana State Employees' Appeals Commission (SEAC) (collectively, the State), appeal the trial court's Order on Petition for Judicial Review, granting judgment in favor of Appellees-Petitioners, Debra Mills (Mills), Thomas Bird (Bird), Jay Matthews (Matthews), Chris Weeks (Weeks), Linda Rumple (Rumple), Darrel Miller (Miller), and Scott Gillenwater (Gillenwater) (collectively, the Employees).[1]

We affirm in part, reverse in part, and remand for further administrative proceedings.

## ISSUE

The State raises three issues on appeal, which we consolidate and restate as the following single issue: Whether the trial court erred in reversing the Final Order of the SEAC based on the fact that the State presented substantial evidence that the Employees were laid off from their positions at the DOC in accordance with statutory requirements.

---

[1] Two additional former DOC employees, Timothy Hygh (Hygh) and Jeffery Mellott (Mellott), participated in the merit complaint process as further described below; however, they did not join with the rest of the Employees in seeking judicial review of the SEAC's administrative ruling and are not parties to this appeal. Facts pertaining to Hygh and Mellott are included where relevant.

## FACTS AND PROCEDURAL HISTORY

[4]     In 2009, Indiana's governor and the commissioner of the DOC implemented the "Facility Forward" initiative, which was designed to "enhance prison capacity, maximize current state property and assets, decrease spending through cost savings, and increase overall efficiencies, while still providing the utmost safety and security for the State of Indiana." (Agency Record Vol. II, p. 342). Part of the Facility Forward plan called for transferring the juvenile inmates from the Indianapolis Juvenile Correctional Facility (IJCF) in Indianapolis, Marion County, Indiana, to a new facility—the Madison Juvenile Correctional Facility (MJCF)—in Madison, Jefferson County, Indiana. The MJCF was slated for opening in October of 2009. Part of the cost-saving measures of the Facility Forward initiative also included replacing certain DOC employees with private contractors.

[5]     On July 7, 2009, DOC administrators and representatives from the Indiana State Personnel Department (SPD) called for a meeting with the institutional teachers at the IJCF—*i.e.*, the Employees. The Employees were notified that, in conjunction with the transfer of the juvenile offenders to the MJCF, the institutional teaching positions at IJCF were being eliminated because the DOC intended to fill the teaching roles through contracts with universities. Accordingly, the Employees' employment would be terminated as of August 14, 2009. During subsequent meetings with the Employees on July 10, 2009, and July 17, 2009, it was made clear to the Employees that they were being laid

off due to the elimination of their positions; they were not being terminated for cause.

[6] At the time, Indiana's State Personnel Act was in effect, which set forth specific procedures to be used in the event of a layoff of merit employees in the State's classified service (which, as the parties agree, applies to the Employees). *See* Ind. Code § 4-15-2-32 (repealed by P.L. 229-2011, Sec. 269, effective July 1, 2011). Upon a department head's determination that a layoff was necessary, the department head was required to notify the director of the SPD, who would then compute the retention points of each employee within the affected class based upon the employees' seniority, service ratings, veterans' preference status, and employment status. I.C. § 4-15-2-32(a) (repealed 2011). These retention scores were to be utilized to determine the order of layoff, whether employees were eligible to displace (*i.e.*, bump) others in the department, and the employees' priority status on a re-employment list. I.C. § 4-15-2-32 (repealed 2011). At each of the meetings discussing their impending layoff, the Employees requested copies of their retention scores. While a few Employees recalled that the SPD representatives promised to provide the retention scores at a subsequent meeting but failed to do so, other Employees stated that they were explicitly told that retention scores would not be figured because their positions were being eliminated and they had no bumping or other layoff rights. Regardless, it is undisputed that the Employees were not provided with a copy of their retention scores until after litigation commenced.

[7] On July 31, 2009, the Employees filed individual merit complaints with the DOC, indicating that they were wrongfully terminated without cause, that their terminations were retaliatory, that they had not been advised of their retention points, that their bumping/reassignment rights were ignored, and that the timing of the termination created a hardship.[2] Although not all of the Employees sought specific relief, others explicitly requested to be retained in their current positions at their current salaries or to otherwise be reassigned as an institutional teacher at another DOC facility. On August 3, 2009, the DOC responded to the Employees and advised that it was unable to provide the requested relief. On August 14, 2009, the Employees were officially terminated from their institutional teaching positions with the DOC.

[8] Sometime after the July meetings, the Employees received letters regarding their layoffs and were asked to submit a form indicating whether they wanted to be considered for re-employment should any other institutional teaching positions become available. All of the Employees opted to be placed on a re-employment list, with some of them specifying that they would be willing to work within any county in Indiana and with others indicating that they would accept employment only in certain counties. At the time he received his layoff letter, Bird also received notice that he was eligible to "bump" into a correctional sergeant or a correctional officer position; Bird declined these DOC

---

[2] The Employees' separate causes were consolidated by order of the administrative law judge on May 3, 2013.

employment opportunities. (Agency Tr. p. 155). In addition, shortly after the layoff, both Weeks and Mellott received letters, inviting them to accept an institutional teacher position in a DOC facility in Fort Wayne, Indiana. Weeks declined, but Mellott accepted the position; however, Mellott quit after thirteen weeks upon discovering that layoffs were imminent at that facility as well. Also, at some point after the layoff, both Miller and Hygh received letters from the SPD indicating that they had been declined for state jobs for which they had never applied.

[9]     On August 18, 2009, the Employees appealed their terminations to the SPD. On August 25, 2009, the SPD denied the Employees' merit complaints because it found that the DOC had followed the proper procedures for layoffs. The SPD further informed the Employees that they had been "placed on a Recall list for the Institutional Teacher classification and will remain on the list for one (1) year from the date of the layoff." (Agency Record Vol. I, p. 7).

[10]    On September 9, 2009, the Employees filed requests for administrative review with the SEAC,[3] which would be heard by an administrative law judge (ALJ). On October 5, 2009, the ALJ conducted a prehearing conference and issued a Scheduling Order on October 13, 2009. Pursuant to the Scheduling Order, the "[SPD] [was to] calculate retention scores for [the Employees]. And [SPD] and/or [the DOC] [would] answer and document whether any institutional

---

[3] The SEAC is statutorily authorized "[t]o hear or investigate those appeals from state employees . . . and fairly and impartially render decisions as to the validity of the appeals or lack thereof." I.C. § 4-15-1.5-6(1).

teacher positions exist currently in Marion County. Depending on the for[e]going responses, [the Employees] [would] consider whether they wish to pursue any further theories of remedy or recovery and whether SEAC is the preferred forum for doing so." (Agency Record Vol. I, p. 63). A telephone status conference was held on November 2, 2009, and the ALJ, again, subsequently issued a Scheduling Order. This Scheduling Order noted that the SPD had "provided [the Employees'] retention scores as required by law and [the DOC] ha[d] indicated [six] institutional teacher positions remain in Marion [County], [three] vocational teaching positions and [three] administrators." (Agency Record Vol. I, p. 65).

[11] Almost two years later, on October 24, 2011, the Employees filed a motion for summary judgment. In support of their motion, the Employees argued that the DOC violated the State Personnel Act because it "intentionally created vacancies by firing the [Employees] in furtherance of [using private contractors], willfully refused to follow the statute regarding those vacancies, and further (inexplicably) refused to grant the [Employees] their retention scores or bumping rights pursuant thereto." (Agency Record Vol. I, p. 94). On November 3, 2011, the ALJ ordered the Employees to supplement their summary judgment motion to show that they had higher retention scores than the remaining institutional teachers and that they were entitled to bump into the positions of those remaining teachers. The Employees requested permission from the ALJ to conduct additional discovery to compile retention scores, but the DOC responded that, on October 15, 2009, it had faxed "a table purporting

to be a listing of all Institutional Teacher 4 positions in Marion County on July 7, 2009," along with their retention scores. (Agency Record Vol. I, p. 283). Accordingly, determining that the Employees were in possession of all necessary information, the ALJ instructed them "to revise the chart so it indicates on its face its conformity and accuracy 'as of' the date of layoffs at issue, and so it indicates which positions survived the layoff." (Agency Record Vol. I, p. 283).

[12] On February 27, 2012, the ALJ denied the Employees' motion for summary judgment, finding that the Employees had failed to supplement their motion as ordered and that they "[f]ailed to articulate a cogent claim upon which relief can be granted that goes beyond a speculative or vague claim of a state conspiracy to make lawful independent contracting decisions that the [Employees] simply do not agree with." (Agency Record Vol. I, p. 287). In addition, as to the Employees' purported rights to "bump" into other DOC positions, the ALJ noted that the Employees made "no formal designation of evidence . . . and little use of such retention scores to show what alleged, specific job positions the [Employees] are claimed entitled to bump into." (Agency Record Vol. I, pp. 282-83 n.1). The ALJ ordered the Employees to show good cause, within ten days, as to why their case should not be dismissed with prejudice.

[13] On March 13, 2012, the ALJ dismissed the Employees' case for failing to tender good cause. However, the next day, the ALJ received the Employees' submission of good cause, which had apparently been filed on March 8, 2012.

In their submission, the Employees proffered that the DOC had provided inadequate information to determine the accuracy of the proffered retention scores and whether any positions were available for the Employees to bump into. Because the Employees had timely filed their submission of good cause, on March 15, 2012, the ALJ vacated its order of dismissal. On April 3, 2012, the DOC responded to the Employees' tender of good cause, claiming that the Employees should have addressed the need for additional information on the matter of the retention points during the discovery phase. According to the DOC,

> [p]ursuant to the file retention schedule set by the [Indiana] Department of Administration, personnel files are only kept in their entirety for one year. The State . . . no longer even uses the merit employment system. It would be an amazing, almost herculean burden on [the DOC] to have to reopen discovery and attempt to find information at this point. Every discovery request from [the Employees] received an appropriate response.

(Agency Record Vol. II, pp. 306-07).

[14] On April 17, 2012, the ALJ conditionally lifted its show cause order. In addition, the ALJ noted that "[t]he limited discovery that [the Employees] seek is sworn answers from the [DOC] about the prior list of retention scores furnished in October[] 2009. This ALJ is skeptical that this discovery could not have been completed before, but [the Employees'] counsel says 'not so', and so in the interests of judicial patience and justice, limited discovery shall proceed" in the form of written interrogatories to the DOC "on the subject of the prior list

of retention scores (only)." (Agency Record Vol. II, pp. 309-10). On August 1, 2012, the Employees requested a hearing with the ALJ because they believed the interrogatories they received from the DOC were insufficient and incomplete. The ALJ instructed the Employees that they could file a specific motion to compel, but it does not appear that the Employees ever did so.

[15] On November 9, 2012, the DOC filed a motion to dismiss pursuant to Indiana Trial Rule 12(b)(6) and a motion for summary judgment pursuant to Indiana Trial Rule 56. The DOC argued that the Employees were properly laid-off pursuant to statutory requirements with no violations of layoff rights. The DOC also argued that it did not conduct the layoffs as a means of retaliation. On May 3, 2013, the ALJ granted in part and denied in part the DOC's motion for summary judgment (and found that the DOC's motion to dismiss was either moot or otherwise consolidated with the summary judgment motion based on overlapping arguments). In particular, the ALJ determined that the Employees "were terminated when their positions at the IJCF were eliminated, not for the failure of [the Employees] to perform their jobs adequately. Similarly, [the DOC] has sufficiently proven the events in question were a structured layoff under the former Governor's proper authority, and not for an improper motive." (Agency Record Vol. II, p. 434). However, because the DOC failed to establish that there is no genuine issue of material fact as to whether the Employees were denied their statutory layoff rights, the ALJ denied summary judgment on this basis. Moreover, because of the perpetual delays, which the ALJ largely attributed to the Employees, and because the Employees had

requested several extensions to respond to the summary judgment motion but then failed to do so, the ALJ established that the Employees' recovery would be limited should they be found to prevail on the merits.

[16] On June 3, 2013, the Employees filed a motion to correct error. Although neither the ALJ nor the DOC had received the Employees' response to the DOC's summary judgment motion, the Employees argued that such a response had been timely filed by deposit in the U.S. mail and should have been considered. On June 21, 2013, the DOC objected to the Employees' motion to correct error. On July 22, 2013, the ALJ partially granted and partially denied the Employees' motion to correct error. The ALJ vacated the portion of its decision limiting the Employees' possible recovery as Employees demonstrated that they had attempted to timely respond to the summary judgment motion. In all other respects, the ALJ declined to modify its summary judgment order.

[17] On December 9, 2013, the ALJ conducted an evidentiary hearing with the sole issue being whether the Employees were denied their statutory layoff rights under Indiana Code section 4-15-2-32 of the State Personnel Act. During the hearing, the Employees testified to their belief that the retention points were not calculated prior to litigation such that they were deprived of their bumping and re-employment rights. Specifically, the Employees stated that they were told, in no uncertain terms, that their retention scores would not be calculated because they had no layoff rights. In turn, the DOC presented evidence from a supervisor at SPD, who testified that the Employees' retention points were calculated prior to the layoff even though the scores were never provided

directly to the Employees per SPD policy. The SPD supervisor further added that only one of the Employees, Bird, qualified for bumping rights under the statute, and he declined such an offer.

[18] On March 10, 2014, the ALJ issued its Findings of Fact, Conclusions of Law and Non-Final Order, denying and dismissing the Employees' merit complaints. The ALJ acknowledged that DOC "could have handled the lay[]off in a more delicate manner" but found "no statutory violation warranting damages." (Appellants' App. Vol. II, p. 61). Specifically, the ALJ determined that there was evidence that "the retention scores were calculated at or before the time of the layoff and used to check on bumping or retention"; there were no other positions into which the Employees could have moved by virtue of their retention scores; and the evidence revealed that a re-employment list or its "functional equivalent" was utilized. (Appellants' App. Vol. II, pp. 61, 63). On March 28, 2014, the Employees filed an objection to the ALJ's Non-Final Order with the SEAC. On June 17, 2014, the SEAC conducted an oral argument, and on June 30, 2014, the SEAC issued its Final Order, adopting the determination of the ALJ in its entirety.

[19] On July 30, 2014, the Employees filed a Verified Petition for Judicial Review of the SEAC's decision with the trial court. The Employees named the State, the DOC, and the SEAC as responding parties (*i.e.*, collectively, the State).[4] On

---

[4] The SEAC unsuccessfully moved to be dismissed from the action.

February 19, 2016, the trial court conducted a hearing.[5] On April 6, 2016, the trial court issued its Order on Petition for Judicial Review of the Final Order of the State Employees' Appeals Commission, reversing the determination of the SEAC and instead finding in favor of the Employees. The trial court determined that the SEAC's Final Order was "arbitrary, capricious, not in accordance with law, an abuse of discretion, and not supported by substantial evidence." (Appellants' App. Vol. II, p. 29). Ultimately, the trial court concluded, in relevant part, that the State

> did not compute retention scores at the time of layoff to determine the order of the layoff, did not assess bumping rights either with Marion County or contiguous counties, and did not create or utilize a re-employment list, but instead—by its own admission—ordered the layoff based upon licensure considerations contrary to statute.

(Appellants' App. Vol. II, p. 27). The trial court therefore reversed the SEAC's Final Order and remanded for entry in favor of the Employees and for proceedings on the Employees' damages.

[20] The State now appeals. Additional facts will be provided as necessary.

---

[5] Although a copy of the transcript of this hearing was received by the Clerk of the Indiana Appellate Courts on March 9, 2017, it was not filed due to non-conformance with the Indiana Rules of Appellate Procedure. Despite notice of the transcript's defect, it does not appear that a corrected version was ever re-submitted.

## I. *Standard of Review*

The Administrative Orders and Procedures Act governs judicial review of an agency action. I.C. § 4-21.5-5-1. When our court reviews the decision of an administrative agency, we are bound by the same standard of review as utilized by the trial court and "may not try the cause de novo or substitute [our] judgment for that of the agency." I.C. § 4-21.5-5-11; *Pierce v. State Dep't of Corr.*, 885 N.E.2d 77, 88 (Ind. Ct. App. 2008). Thus, we do not reweigh evidence or assess the credibility of witnesses, and we review the record in the light most favorable to the administrative proceedings. *Ind. Educ. Emp't Relations Bd. v. Nettle Creek Classroom Teachers Ass'n*, 26 N.E.3d 47, 54 (Ind. Ct. App. 2015). In addition, "[j]udicial review of disputed issues of fact must be confined to the agency record." I.C. § 4-21.5-5-11.

Our court will reverse an administrative decision if the party

> seeking judicial relief has been prejudiced by an agency action that is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence.

I.C. § 4-21.5-5-14(d). "A decision is arbitrary and capricious when it is made without any consideration of the facts and lacks any basis that may lead a reasonable person to make the same decision made by the administrative

agency." *Pierce*, 885 N.E.2d at 88. In general, the party seeking judicial relief "bears the burden of demonstrating that the agency's action is invalid." *Id.*; *see* I.C. § 4-21.5-5-14(a). Here, however, the State is appealing from the trial court's decision that the SEAC's Final Order is arbitrary and capricious; thus, the State seeks to establish the validity of the agency action. Accordingly, "[t]he relevant inquiry is whether there is substantial evidence of probative value to support the agency's determination." *Family & Soc. Servs. Admin. v. Boise*, 667 N.E.2d 753, 754 (Ind. Ct. App. 1996), *trans. denied*. "[S]ubstantial evidence is more than speculation and conjecture yet less than a preponderance of evidence. Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ind. Family & Soc. Servs. Admin. v. Pickett*, 903 N.E.2d 171, 177 (alteration in original) (internal quotation marks and citation omitted), *clarified on reh'g*, 908 N.E.2d 1191 (Ind. Ct. App. 2009).

## II. *State Personnel Act*

[23] The State claims that the SEAC's Final Order should be affirmed because there is substantial evidence to establish that the State complied with the State Personnel Act in the course of conducting the layoffs now at issue. The Employees alleged that the DOC violated each of the three subsections of Indiana Code section 4-15-2-32 by (1) failing to calculate and provide retention points in order to properly conduct the layoffs; (2) failing to utilize retention points to administer the Employees' bumping rights; and (3) failing to properly

implement a re-employment list based on retention scores. We will address each point in turn.

[24] First, however, we note that to the extent that the resolution of this case hinges on an interpretation of the (now repealed) State Personnel Act, we must "determine whether the legislature has spoken clearly and unambiguously on the point in question." *Pierce*, 885 N.E.2d at 88 (quoting *St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele,* 766 N.E.2d 699, 703-04 (Ind.2002)). An unambiguous statute must be given "its clear and plain meaning." *Id.* An ambiguous statute, however, is susceptible to more than one interpretation, in which case, "we must try to ascertain the legislature's intent and interpret the statute so as to effectuate that intent." *Id.* Courts presume that "the legislature intended logical application of the language used in the statute, so as to avoid unjust or absurd results." *Id.*

[25] We further note that "'[a]n interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless this interpretation would be inconsistent with the statute itself.'" *Id.* at 89 (quoting *LTV Steel Co. v. Griffin,* 730 N.E.2d 1251, 1257 (Ind. 2000)). "Deference to an agency's interpretation of a statute becomes a consideration when a statute is ambiguous and susceptible of more than one reasonable interpretation." *Id.* Thus, "[w]hen a court is faced with two reasonable interpretations of a statute, one of which is supplied by an administrative agency charged with enforcing the statute, the court should defer to the agency." *Id.* If a court determines that an agency interpretation is reasonable,

it need not address the other party's proposed interpretation in recognition of "the general policies of acknowledging the expertise of agencies empowered to interpret and enforce statutes and increasing public reliance on agency interpretations." *Id.* (quoting *Ind. Wholesale Wine & Liquor Co., Inc. v. State ex rel. Ind. Alcoholic Beverage Comm'n,* 695 N.E.2d 99, 105 (Ind.1998)). That said, "[i]f an agency misconstrues a statute, there is no reasonable basis for the agency's ultimate action and the trial court is required to reverse the agency's action as being arbitrary and capricious." *Id.*

## A. *Calculation of Retention Points*

[26] The State contends that the trial court improperly reversed the SEAC/ALJ because there is ample evidence that the Employees' retention scores were calculated in accordance with the State Personnel Act. Former Indiana Code section 4-15-2-32(a) provides as follows:

> (a) An appointing authority[6] may lay-off employees in the classified service whenever it is deemed necessary, due to shortage of work or funds, or the abolishment of a position, or other material change in duties or organization. For purposes of this section, offices and positions of employment in each county where the division of service operates is considered one autonomous unit and lay-off procedures will apply within the county affected by the lay-off. When a lay-off is necessary, the appointing authority will determine in which class or classes the lay-off or lay-offs will occur, the number of employees to be laid off within each

---

[6] "'Appointing authority' means the head of a department, division, board, commission, individual, or group of individuals who has the power by law or by lawfully delegated authority to make appointments to positions in the state service." I.C. § 4-15-2-2.1 (repealed 2011).

affected class, the county or counties where lay-offs are to occur and give written notice to the director[7] a reasonable time before the effective date of the lay-off. The director, in accordance with the rules, shall compute retention points to determine the order of lay-off within each county. The retention points will be computed as of the effective date of the lay-off and will reflect systematic consideration of seniority, service ratings, veterans' preference status, and employment status. The director shall provide the appointing authority with a written notice containing the names and retention points of employees to be laid off in each county, and such orders relating to the lay-off as deemed necessary to secure compliance with this section.

[27] In this case, there is no dispute that, prior to litigation, the Employees never received copies of their retention scores. During the administrative hearing, the Employees testified that, at the time they were notified of the impending layoff, the DOC and SPD representatives made it clear that retention scores would not be figured or provided. When the retention scores were eventually provided during litigation, the Employees discovered that seven Marion County DOC employees with the same classification (*i.e.*, institutional teachers) had survived the layoff. Because several of the Employees had higher retention scores than these institutional teachers who were not laid off, the Employees maintained that the layoffs were not conducted in accordance with seniority. The Employees also raised concerns that the DOC did not explain what factors it considered in calculating the scores. Finally, the Employees challenged the

---

[7] "'Director' means the state personnel director . . . ." I.C. § 4-15-2-2.7 (repealed 2011).

timeliness and validity of the retention scores due to purported errors in the chart, such as the inclusion of a few retired and terminated DOC employees and because the chart was dated several years after the layoff.

[28] Contrary to the Employees' contentions, the ALJ made the following specific findings and conclusions relevant to the calculation of retention scores:

> 15.    Joyce Crull [(Crull)], an employee of SPD, testified regarding Exhibit A [(*i.e.*, the retention score chart)]. . . . Crull did not personally calculate the retention scores/points. However, . . . Crull directly supervised the individual (Nancy Shockley [(Shockley)], a former state employee who did not testify) who calculated the retention points and compiled Exhibit A. . . . Crull had personal knowledge that the task was done either before or at the time of the layoff.  When pressed on cross exam, her only waffle was exclaiming that the scores might have actually been calculated in 2009 [*sic*], prior to the layoff. . . . Crull explained that the date on the lower corner [(*i.e.*, 8/30/2012)] is the date Exhibit A was first printed, and not the date that the retention points were first calculated.
>
> 16.    . . . Crull further explained that employees would never be told where they sit, per retention points, on a list prior to the effective date of the layoff, which was consistent with DOC's actions.
>
> * * * *
>
> 23.    . . . Part of the trial effort by [the Employees] was to imply that retention scores were not calculated in 2009, or that Exhibit A was made up after the fact.  [The Employees] also claimed there was inaccurate information reported in Exhibit A.  However, the alleged inaccuracies were either not there, not material or de minimis.

24.     There were [institutional teachers] listed on Exhibits A-B who no longer worked at IJCF exactly when the layoffs occurred because they had left state employment shortly before the layoff. While this is not ideal, it supports the [DOC's] contention and credibility of . . . Crull, . . . that the scores were calculated before the litigation in 2009. Also, post layoff dates contained at the bottom of the pages were mentioned. However, no witness was able to provide any specific evidence that the retention scores, as reported in Exhibit A-B, were not accurate.

25.     [Weeks] further pointed out that one of the columns appeared to be transposed. But, transposition aside, he admitted on cross exam that his data was correct. No harm is shown by the same.

26.     [Mills] asserted she should have been one notch up the list on Exhibit A, where [Zelda Lewis (Lewis), a vocational teacher at Indiana Women's Prison who was not laid off,] was. Yet, the list shows [Lewis] started earlier than [Mills], making the opposite seem true. [Mills] thought maybe [Lewis'] start date was wrong (and closer to [Mills]), but this was speculation. . . .

* * * *

28.     The scores were calculated to the hundredth place, yet [the Employees] questioned the accuracy of the scores. The criticism came without personal knowledge of how retention scores are calculated. Attacking the accuracy of the scores was based on mere speculation. [While the [S]tate was to use certain factors in calculating the scores, the [S]tate was not required to break down the scores into subparts or explain the calculation to [the Employees]. In other words, the [Employees] wondering about the calculation method offers nothing of evidentiary value.]

29.     The chart has inherent credibility that outweighs the [Employees'] speculation, as the information generally lines up with the employment figures, at the time of the layoff, for those

listed, (e.g., hire dates, ranking, job title, job unit, annual pay rate). Again, the scores themselves appear mathematical and are out to the hundredths place. Exhibits A and B do not contain material problems.

* * * *

31.     John Nally [(Nally)], a central office administrator for DOC, also supported . . . Crull's testimony. His memory of all the events had faded, but he did specifically recall a request from SPD asking him to compile all of the [Employees'] credentials at some point prior to the layoff. He believed the request was in connection to retention score calculation activities, as . . . Crull said.

* * * *

11.     [Indiana Code section 4-15-2-32(a)] requires the SPD to calculate retention points for every laid-off employee at the time of layoff. There is conflicting evidence regarding whether the retention points were calculated prior to the layoff or at the time of layoff. Either way, DOC presented evidence that the retention scores were calculated at or before the time of the layoff and used to check on bumping or retention. However, there is no question that copies of these retention scores were not given to the [Employees] until litigation. Counsel for DOC maintains that DOC or SPD did not provide the score copies to [the Employees] in July, 2009 because of its belief at the time that none of the [Employees] had bumping rights.

12.     [The Employees] requested their retention points at each of the meetings on July 7, 10, and 17, 2009. DOC did not provide copies of the retention scores. DOC was not obligated to provide copies of retention scores at this point, as it was prior to the layoffs. However, once the layoff happened, DOC should have furnished the scores that day, but did so repeatedly shortly

after in litigation.[8]

> 13. The evidence shows [DOC] at least went through the deliberative process of computing retention scores and did use and provide the retention scores in 2009. Any failure to forward copies of the retention scores to [the Employees] in July 2009 was not material, de minim[i]s or harmless.

> 14. Based on the unopposed testimony, it is impossible that . . . DOC or SPD failed to compute or use the retention scores because [Bird] was offered, in writing, a position in a lower class shortly after the layoffs in 2009. The employment offer was based on his retention points and having achieved permanent status in a lower class. If a retention score did not exist, SPD would not have offered the position or used the term "bump" in its correspondence.

(Appellants' App. Vol. II, pp. 55, 56, 57 & n.13, 61) (citations and footnotes omitted).

We find that the evidence in the record supports the ALJ's findings, which, in turn, support the ALJ's determination (as adopted by the SEAC) that the DOC did not violate the State Personnel Act with respect to calculating retention scores. Although there was conflicting evidence regarding whether retention scores were calculated prior to the layoff or only after the commencement of litigation, it was within the discretion of the ALJ to weigh that evidence and

---

[8] The ALJ's conclusion that the DOC should have provided the scores to the Employees upon layoff is based on its assessment of Indiana Code section 4-15-2-30 (repealed 2011) and Indiana Code section 5-14-3-4(b)(8), when read in conjunction with the statute at hand. The ALJ noted that these other provisions "provid[e] access to employee records." (Appellants' App. Vol. II, p. 61).

accord credibility to Crull's testimony that the retention scores were positively calculated prior to the layoff and were current per SPD standards as of the effective date of the layoff. Specifically, Crull testified that retention scores are considered current so long as they are calculated no more than six months preceding the layoff. She further stated that upon the DOC's notice of layoff, the SPD would have required "time in order to review the whole document of the [E]mployees' records" and then would have "draw[n] a list up of individuals in the classification throughout the county under DOC." (Agency Tr. pp. 47, 49-50).[9]

[30] Moreover, based on a plain reading of the statute, neither the DOC nor the SPD was required to provide the retention scores to the Employees or to offer a breakdown of how such scores were calculated. Rather, the State Personnel Act simply requires the SPD director to figure the retention scores using the statutory criteria and then provide a list to, in this case, the head of the DOC containing only the names and retention points of the employees in the designated classification. While the record does not include evidence of the specific data utilized, there is substantial evidence—that is, more than

---

[9] To support its claim, the State primarily relies on the interrogatory responses of Shockley, who calculated the retention scores and explained the date she did so and what factors were considered. Although Shockley's interrogatory was included with the agency record, it was not admitted as evidence during the hearing and the ALJ did not take official notice of the facts stated therein. *See* I.C. § 4-21.5-3-26. Furthermore, Shockley did not testify during the hearing, and nothing in the ALJ's findings and conclusions indicates that it relied upon her interrogatory to support its determination. *See* I.C. § 4-21.5-3-27(d) ("Findings must be based exclusively upon the evidence of record in the proceeding and on matters officially noticed in that proceeding. . . ."). Thus, we do not consider Shockley's interrogatory as evidence.

speculation but less than a preponderance—that the State complied with the statutory criteria for factoring the retention scores. *Pickett*, 903 N.E.2d at 177. Crull testified that the retention scores were calculated using "the entire working record, the continuous record of the [Employees,]" and the retention chart included information pertinent to calculating scores, such as the Employees' hire dates, job titles, department information, and salaries. (Agency Tr. p. 45). Also, Nally testified that, prior to the layoff, he provided information on the Employees' credentials to the SPD for use in calculating retention scores.

[31] In reversing the SEAC/ALJ, the trial court determined that retention scores were not calculated at the time of the layoff based on the testimony of the Employees and the October 13, 2009 Scheduling Order, which directed the DOC to "calculate retention scores for [the Employees]." (Agency Record Vol. I, p. 63). We first note that this Scheduling Order does not establish that such scores had not been previously calculated inasmuch as it ordered the DOC to provide copies of those scores to the Employees. Furthermore, the fact that the trial court discredited the ALJ's findings on the basis of this Scheduling Order and conflicting testimony of the Employees amounts to improper reweighing of the evidence.

[32] Finally, we address the Employees' assertion that the DOC violated the State Personnel Act because several institutional teachers remained employed at the central administration office and Indiana Women's prison, despite having lower retention scores than some of the Employees. While the ALJ's findings

on this issue primarily relate to whether the Employees had the right to "bump" these other institutional teachers out of their jobs, which we discuss in an analysis of Indiana Code section 4-15-2-32(b) below, we must also consider this argument in the context of whether the DOC violated Indiana Code section 4-15-2-32(a) by not relying on the retention scores to determine the proper order of layoff of institutional teachers within Marion County.

[33]   At the time the Employees were laid off, seven employees classified as institutional teachers remained employed by the DOC in Marion County: three vocational teachers at the Indiana Women's Prison and four administrators in DOC's central office. However, there is evidence indicating that, at some point, the vocational teachers were also eliminated in favor of using private contractors. During the hearing, Nally testified that the DOC "wanted people in Central Office with District Administrator's Licenses," which is why the four individuals with administrative licenses were retained notwithstanding whether their retention scores were higher than the laid-off Employees. (Agency Tr. p. 294). Thus, the Employees argue that the layoffs ran afoul of the State Personnel Act because they were done in accordance with licensing needs rather than seniority.

[34]   The State Personnel Act authorizes the head of a department to conduct layoffs whenever "deemed necessary, due to shortage of work or funds, or the abolishment of a position, or other material change in duties or organization." I.C. § 4-15-2-32(a) (repealed 2011). Here, the institutional teaching positions were abolished at the IJCF. While the administrative employees at issue were

technically also classified as institutional teachers, they did not function in such a capacity and, in fact, held special licenses to fulfill other duties for the DOC in the central office. Although the State Personnel Act does state that layoffs within a certain class should be conducted in order of seniority, we find that it would defy logical reasoning to construe the State Personnel Act as requiring an agency to lay off licensed/qualified employees only to move more senior employees into positions for which they are patently unqualified. *See Citizens Action Coal. of Ind., Inc. v. N. Ind. Pub. Serv. Co.*, 796 N.E.2d 1264, 1269 (Ind. Ct. App. 2003) ("[A] statute is to be construed so as to not bring about an absurd result."), *trans. denied*. Accordingly, we agree with the SEAC/ALJ and find that the State did not violate Indiana Code section 4-15-2-32(a) of the State Personnel Act.

## B. *Bumping Rights*

[35] The State next contends that the trial court erroneously reversed the SEAC/ALJ because the evidence demonstrates that it complied with Indiana Code section 4-15-2-32(b) (repealed 2011), which provides as follows:

> (b) An employee in the classified service who has been notified of pending lay-off and who has permanent status in a lower class has the right, provided they have more retention points, to displace within the same affected county, the employee with the least retention points in that lower class. Any employee in the classified service who has permanent status in a lower class and is displaced by another employee has the right, provided they have more retention points, to displace within the same affected county the employee with the least retention points in that lower class. This procedure shall continue until the employee with the

least retention points in the lowest class, in the same affected county, of the same appointing authority has been reached and if necessary, laid off. Should a layoff result in the closing of all offices in a county, any employee in the classified service who has been notified of pending lay-off and who has permanent status in the class from which they are laid off may, provided they have more retention points, displace within the division of service in any contiguous county the employee with the least retention points in that class.

[36]     Contrary to the State, the Employees assert that the DOC failed to assess their bumping rights within Marion County. We disagree. Based on the plain language of this statute, in order to qualify for bumping rights, an employee must have permanent status in a lower class *and* must have higher retention points than an individual employed in that lower position within the same county. Thus, the statute makes it clear that the Employees had no right to laterally displace other institutional teachers within the county even if they had a higher retention score. Furthermore, as the ALJ found based on the retention score chart, only Bird had permanent status in lower classes—as both a correctional sergeant and a correctional officer. Shortly after the layoff, Bird admitted that he received an offer to "bump" into a correctional sergeant or correctional officer position, but he declined. (Agency Tr. p. 155). Mills and Matthews both testified to their belief that they had permanent status as, respectively, a librarian and a teacher's assistant for which they should have received bumping rights. However, this is contradicted by the DOC's retention chart, and the ALJ was charged with weighing the evidence.

Additionally, the Employees insist that they should have been able to bump into other institutional teaching positions within the counties contiguous to Marion County based on the fact that all DOC institutional teaching jobs were eliminated within Marion County. The statute provides that in the event that "all offices in a county" are closed due to layoffs, institutional teachers with permanent status as institutional teachers could displace other institutional teachers who had lower retention scores within the contiguous counties. I.C. § 4-15-2-32(b) (repealed 2011). The ALJ specifically found that this provision "has no application because DOC's Marion County office was not closed down entirely." (Appellants' App. Vol. II, p. 62). In particular, the evidence revealed that the DOC's central office, located in Marion County, remained operational. Likewise, although it was staffed with private contractors instead of institutional teachers, the Indiana Women's Prison, also located in Marion County, did not shut down. Therefore, like the SEAC/ALJ, we find that there is substantial evidence that the State did not violate Indiana Code section 4-15-2-32(b) of the State Personnel Act.

C. *Re-Employment List*

Lastly, the State asserts that the trial court erroneously reversed the SEAC/ALJ because the evidence establishes that, in conducting the layoffs, the State adhered to Indiana Code section 4-15-2-32(c) (repealed 2011), which provides:

> (c) Employees who have been reduced or laid off will be placed on appropriate re-employment lists in accordance with rules established by the director. Those employees with the highest retention points in each affected class will be placed at the top of

the list followed by employees ranked in descending order. An employee who is laid off will retain re-employment rights for a period of one (1) year from the lay-off date. During this one (1) year period, the appointing authority, for the division of service affected, shall not hire nor promote anyone into a class affected by the lay-off until all laid off employees on the re-employment list for that class have been reinstated or decline the position when it is offered. Employees who fail to respond within five (5) days, to a written offer sent to their last known address, will be deemed to have declined. Even though a lay-off applies only to affected counties, re-employment rights extend to all counties, and at the request of the laid off or reduced employee, their name will be placed on the appropriate re-employment list for any or all counties.

The Employees have insisted that no re-employment list was ever created or utilized. In fact, no such list was ever produced during the course of litigation.

[39]     The ALJ concluded, and the SEAC agreed, that there was substantial evidence that the Employees "were placed on re-employment lists or the functional equivalent." (Appellants' App. Vol. II, p. 63). In particular, the ALJ found:

> 33.     The existence of a re-employment list, or [its] functional equivalent, was further bolstered by evidence of automatic employment applications with the State. Several [Employees] described receiving correspondence thanking them for applying to jobs even though they never personally applied. This evidence suggests that a re-employment list was in existence and utilized for automatic application to qualified positions, especially because this happened to more than one [of the Employees].
>
> 34.     [Weeks] stated he received a letter from SPD in early 2010 that listed a position in Fort Wayne, IN that was similar to his old job. While the letter did not mention bumping rights or

retention scoring, [Employee] Weeks testified that it mentioned special consideration.

> 35.     . . . [Mellott], in fact was rehired to a DOC facility in Northeast Indiana.  However, [Employee] Mellott chose to quit after a number of weeks because that facility was also going through an active layoff.  This episode shows the breadth of the layoff, the lack of open DOC [institutional teacher] positions within one year, and that DOC was considering the [Employees] not as fired but as laid off on a list.

(Appellants' App. Vol. II, p. 57) (citation omitted).  Unlike the trial court, which determined that there was "no evidence *at all* establishing the existence of . . . re-employment lists," we agree with the SEAC/ALJ that there is substantial evidence that a re-employment list was created and utilized based on the fact that employment offers were made to certain Employees within a short time after the layoff.  (Appellants' App. Vol. II, p. 25).

[40]    Nevertheless, we find that the evidence establishes that the State failed to comply with the specific procedure for implementing a re-employment list.  The statute makes it abundantly clear that the Employees "with the highest retention points" should have been "placed at the top" of the re-employment list for institutional teachers.  I.C. § 4-15-2-32(c) (repealed 2011).  In this case, two of the Employees, Weeks and Mellott, were offered re-employment as institutional teachers shortly after the layoff in Fort Wayne, which Mellott ultimately accepted.  However, according to the retention score chart, of the nine Employees who filed merit complaints, Weeks was ranked sixth and Mellott was ranked ninth in terms of retention points.  Gillenwater, Mills,

Miller, and Bird all informed the SPD that they would be willing to accept re-employment as an institutional teacher in any Indiana county and all had higher retention scores than both Weeks and Mellott. Yet, none of these four were offered the institutional teacher position in Fort Wayne (or anywhere else for that matter) prior to Weeks and Mellott being afforded the opportunity.[10] There is no evidence that there were special certification or licensing requirements for the Fort Wayne position; rather, it appears that all of the Employees were qualified for any such institutional teaching position. Accordingly, the fact that the State did not offer re-employment opportunities in accordance with seniority is a violation of the State Personnel Act. We therefore agree with the trial court that the SEAC's Final Order is not in accordance with the law on this issue. Thus, the matter should be remanded to the SEAC/ALJ for a determination of whether some or all of the Employees are entitled to damages based on the State's failure to comply with former Indiana Code section 4-15-2-32(c) in light of the fact that so few re-employment opportunities were available in the year following the layoff.

## CONCLUSION

Based on the foregoing, we conclude that SEAC/ALJ properly determined that the State calculated the Employees' retention scores and adhered to statutory layoff rights in accordance with Indiana Code section 4-15-2-32(a)-(b) (repealed

---

[10] We note that Rumple had the second highest retention score of the nine Employees; however, she indicated that she would only accept employment in the counties surrounding Marion County; thus, she would not have been offered the Fort Wayne position regardless.

2011). However, we also conclude that the State failed to comply with the State Personnel Act's requirement that laid-off employees with the highest retention scores be afforded the first opportunity for re-employment. Thus, the trial court correctly reversed the Final Order of the SEAC with respect to Indiana Code section 4-15-2-32(c) (repealed 2011).

[42] Affirmed in part, reversed in part, and remanded for further agency proceedings.

[43] Altice, J. concurs

[44] Crone, J. concurs in part and dissents in part with separate opinion

| | |
|---|---|
| State of Indiana, Indiana Department of Correction, and Indiana State Employees' Appeals Commission,<br><br>*Appellants-Respondents,*<br><br>v.<br><br>Debra Mills, *et al.*,<br><br>*Appellees-Petitioners* | Court of Appeals Case No. 49A02-1605-PL-998 |

**Crone, Judge, concurring in part and dissenting in part.**

[45]     I respectfully disagree with the majority's conclusion that the State did not violate the State Personnel Act by retaining four employees classified as institutional teachers who held administrative licenses but had lower retention scores than some of the Employees.[11]   Indiana Code Section 4-15-2-32(a) specifically states that the order of lay-off for each class within a county is

---

[11] The majority's suggestion that the Employees were "patently unqualified" for those positions is an insult to them and ignores their years of loyal service.

determined by retention points, not by licensing considerations. We may not read into a statute that which is not the expressed intent of the legislature. *In re Guardianship of Stant*, 50 N.E.3d 149, 152 (Ind. Ct. App. 2016), *trans. denied*. In all other respects, I concur.