FILED

May 29 2020, 8:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



**ATTORNEY FOR APPELLANT**

Adam Lenkowsky
Roberts Litigation Group
Indianapolis, Indiana

**ATTORNEY FOR APPELLEE**

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Timothy J. Brown,

*Appellant-Petitioner,*

v.

Indiana Department of
Environmental Management,

*Appellee-Respondent,*

May 29, 2020

Court of Appeals Case No.
19A-MI-2051

Appeal from the Marion Superior
Court

The Honorable Tim Oakes, Judge

Trial Court Cause No.
49D02-1810-MI-41395

**Robb, Judge.**

# Case Summary and Issues

[1] Timothy Brown appealed his termination from the Indiana Department of Environmental Management ("IDEM") to the State Employees' Appeals Commission ("SEAC"), alleging that he was terminated in violation of Indiana's Whistleblower Law based on three emails he sent to his supervisor concerning IDEM's alleged misuse of public resources and violation of law. IDEM moved to dismiss Brown's complaint, which the SEAC granted. Brown filed his first petition for judicial review and the trial court reversed the SEAC's decision and remanded for further proceedings.

[2] On remand, IDEM filed a motion for summary judgment. The SEAC granted IDEM's motion and found that Brown's emails constituted a "report" under the whistleblower statue, but he failed to show that the reports contained any violation of law or how IDEM was allegedly misusing funds. The SEAC also concluded there was no causal link between Brown's termination and his whistleblower claim. Brown filed a second petition for judicial review, which the trial court denied. Brown appeals, raising six issues which we consolidate into two restated issues: (1) whether the trial court erred in determining that the SEAC's decision that Brown was not a whistleblower was not arbitrary, capricious, or an abuse of discretion; and (2) whether the trial court erred in concluding the SEAC's decision was supported by substantial evidence. Concluding the trial court did not err in either determination, we affirm.

# Facts and Procedural History

[3]     Brown was employed by IDEM for approximately twenty-one years before he was terminated on May 6, 2016. At the time of his termination, he was an Environmental Chemist II in the Air Toxics Section and was considered an unclassified, at-will employee. His May 6 termination letter stated, in pertinent part:

> Your job responsibility during the month of April, 2016 included management of the primary Gas Chromatograph/Mass Spectrometer (GCMS) system. It was confirmed that you had run samples without verifying a valid calibration, one of three quality control standards required prior to the daily analysis of field samples. On at least two occasions, you analyzed samples and reported invalid data as valid. Your failure to perform the basic task of checking the calibration does not meet performance standards and reporting false data is considered a dishonest act. Both actions are unacceptable, do not meet agency standards, and are the reason[s] for this disciplinary action.
>
> You are hereby notified that effective May 6, 2016, your employment is terminated in accordance with IC 4-15-2.2-24 which provides "An employee in the unclassified service is an employee at will and serves at the pleasure of the employee's appointing authority . . . and may be dismissed, demoted, disciplined or transferred for any reason that does not contravene public policy."

Appendix of Appellant, Volume II at 42.

Brown appealed his termination to the SEAC on August 3, 2016, alleging six claims, including a whistleblower retaliation claim.[1]  *See id.* at 49-64. Specifically, Brown alleged that he was terminated for being a whistleblower in violation of Indiana Code section 4-15-10-4, Indiana's State Employee Whistleblower Law ("WBL")[2] for emailing his supervisor and inadvertently revealing "what could be viewed as federal grant fraud[.]"  *Id.* at 59.  Brown relied on three April 2016 emails as his "report" but did not attach them to his complaint or provide them to the SEAC.

On October 7, 2016, IDEM filed a motion to dismiss and supporting brief, in which it argued that SEAC lacked subject matter jurisdiction to hear Brown's complaint and Brown failed to state a claim upon which relief could be granted. *See id.* at 78.  Specifically, IDEM alleged that Brown failed to "report" violations as required by statute and failed to establish "that a public policy exception [pursuant to Indiana Code section 4-15-2.2-42(f)[3]] to the employment at will doctrine was the reason for his discharge."  *Id.*  And on December 16, 2016, the SEAC granted IDEM's motion, finding, in part, that Brown failed to offer any evidence to show his alleged protected activity was related to his

---

[1] In addition, Brown alleged abuse of process, supervisor breach of fiduciary duty, conspiracy, false accusation and estoppel, and breach of contract.  Brown later voluntarily dropped these claims leaving only his whistleblower retaliation claim for the SEAC to analyze.  *See id.* at 116 n.2.

[2] This statute is contained in the State Employees' Bill of Rights.  Ind. Code ch. 4-15-10.

[3] This section states:  "An unclassified employee must establish that the commission has subject matter jurisdiction to hear the employee's wrongful discharge claim by establishing that a public policy exception to the employment at will doctrine was the reason for the employee's discharge.  The former employee has the burden of proof on this issue."

termination and that he was terminated for reporting invalid data. *See id.* at 121, ¶¶ 16-17. The SEAC concluded no other public policy exception had been raised and therefore, the SEAC lacked subject matter jurisdiction to hear Brown's complaint. *Id.* at ¶ 18.

[6] Brown subsequently sought judicial review of the SEAC's order by filing his Verified Petition for Judicial Review on January 6, 2017. In his petition, Brown alleged that the SEAC "prematurely concluded that his allegations demonstrated that he had not 'reported' anything because his communication was 'inadvertent'" and that the SEAC erred in concluding he had not demonstrated a causal connection between his termination and alleged whistleblowing activity. *Id.* at 131, ¶¶ 22, 25.

[7] On November 21, 2017, the trial court issued an order granting Brown's petition and remanding the matter to the SEAC for further proceedings. In its order, the trial court concluded that Brown had sufficiently stated a claim for relief. The trial court concluded that the SEAC clearly erred in determining the reason for Brown's discharge "when this could not be decided without reference to matters outside of the pleadings" and that the SEAC's order dismissing Brown's complaint without evidence of Brown's emails was arbitrary and capricious, in excess of authority, without observance of legal procedure, and otherwise unsupported by substantial evidence. *Id.* at 140, ¶¶ 21, 25. The matter was remanded to the SEAC.

[8] On June 18, 2018, IDEM filed a motion for summary judgment and designated certain evidence, including Brown's termination letter and Brown's three April 2016 emails he sent to his supervisor, Stacey Pfeffer:

[April 26, 2016 E-mail]

Please recall the Friday before you left for your staycation and the controversy that afternoon in the lab when I was trying to explain to you that I strongly suspected Russell [one of Brown's co-workers] of deliberately engineering the backlog in the canister analysis? Below is the factual basis of my allegations in writing. . . .

On Wednesday March 30, 2016, we received complaint samples from OAQ. On Thursday, March 31, 2016, Russell Bowman ran two calibration checks on the GCMSii. The first one failed, the second one passed[.] No more calibration checks were run after those two allegedly failed, and therefore no can[ister] samples either. Not only did the second calibration check and BFB tune pass according to the [procedures] that Russell himself wrote, Russell did not bother to load up the sampling tree with backlogged sample canisters that needed to be analyzed, including the two complaint samples. Russell also left a backlog of samples to be logged in for the next staffmember who was taking over the workstation[.] When Russell was asked why Russell did not run a batch of canisters and do the complaint samples, Russell made the claim that the calibration check performed on March 31 did not pass, when in fact the calibration check had indeed passed as well as the BFB. In addition, the staffmember taking over Russell's work station for 2nd quarter had never performed a complaint sample on GCMS and was unaware that an official memorandum had to be written for the lab reports. Russell did not apprise the staffmember taking over Russell's position of this part of the procedure. Nor did Russell apprise the acting branch chief. Another result of Russell's

actions, or lack thereof, was that the complaint analysis was unnecessarily delayed by at least a week . . . and the writing of the memorandum by at least 4 weeks. The willful negligence and deception demonstrated by Russell antagonized and provoked the anger of the staffmember taking over Russell's work station, which created unnecessary controversy and undermined group trust and comradery.

* * *

[April 28, 2016 E-mail titled "More Russell antics . . ."]

Russell began experiencing contamination with the TNMOC instrument the last week of first quarter. Certification canisters were not coming out clean enough and a backlog was beginning to develop. When this kind of contamination . . . occurs, an experienced air chemist will first try the simplest and most effective remedy, and that is applying a heat gun to the injection lines. Russell did not try this at all but instead, tried the most elaborate and invasive remedies first[.] These troubleshooting efforts did not work and the result was the same – a contaminated system. The next ECII to take over Russell's workstation during 2nd quarter assumed Russell had tried the obvious heat gun technique first. At this time, the ECII put to task a trainee to do TNMOC duty, and although a few canisters did pass certification, the luck quickly ran out and troublesome contamination was still evident. At the end of the April 25th work day, the ECII trainer realized Russel[l] had not used the heat gun, and so instructed the trainee to try the heat gun. A few days passed, and the ECII trainer asked the trainee if he had tried the heat gun method. The trainee response . . . was "Russell said the heat gun does not work". Not only that but in an uncharacteristic move, Russell feverishly volunteered to "help" the trainee dismantle the six port valve and sonicate the parts . . . again! It is said the definition of insanity is doing something over and over again that clearly does not work. It definitely raises a

question about Russell's masters degree in chemistry and 10 years of Air Toxics experience. Anyway, I speculate that Russell's motivation arose from a combination of Russell's inclination to a) satisfy his OCD like urges, b) defy his fellow chemists, and c) deliberately mislead the trainee down a path of inevitable chronic backlog. Not only was canister backlog growing and growing, it also became apparent that the trainee was getting demoralized and feeling stressed. Yet the trainee was still confident in Russell's guidance to the point of questioning the original trainer's advice. But anyway Russell reassembled the six port valve apparatus and the results were of course the same. Still contaminated. . . .

[T]his is not the only time I have caught Russell giving . . . questionable advice, if not deliberate misinformation. It is distracting, divisive, and it wastes time. . . . A friend of mine worked at Chevy for 40 years and told me stories of the occasional workman who would rig his machine to break all the time. But these workmen were motivated by having extended break time while waiting for the repairman.

\* \* \*

[April 29, 2016 E-mail]

I might also suggest keeping Russell out of the Toxics area and just have him stay in his cubicle. [Another co-worker] and I can handle it.

*Id.* at 194, 200, 202.

[9]     IDEM argued Brown did not "report" a violation of law and his claim of "workplace sabotage" was not a report of the existence of misuse of public

resources for which IDEM retaliated against him. *Id.* at 177-84. And therefore, IDEM argued, Brown did not report a violation of law or misuse of public resources to his supervisor and failed to state a claim for wrongful termination. On September 18, the SEAC issued its order granting IDEM's motion for summary judgment and finding, in relevant part:

23. The first email, dated April 26, 2016, is the email [Brown] relied upon above for his contention that [IDEM] violated federal law. Having already found in favor of [IDEM] on this issue, the [administrative law judge ("ALJ")] also finds that nothing in the email would lead Pfeffer or anyone else to believe that a misuse of public resources was occurring. Instead, the email's tone is simply [Brown] complaining to Pfeffer that Bowman was not doing his job correctly.

24. The second email, dated April 28, 2016 was entitled, "More Russell (Bowman) antics". In it, [Brown] again complains about Bowman not doing his job correctly with regard to using a heat gun to solve a problem with contamination of some of the samples. After listing his complaints, [Brown] concludes by saying that Bowman's antics were to satisfy Bowman's OCD urges, defy his fellow chemists and deliberately mislead a trainee down a path of inevitable chronic backlog. Again, the ALJ finds that nothing in the above email would lead Pfeffer to believe that [IDEM] was committing grant fraud, or was otherwise misusing public resources. Therefore, the ALJ finds [Brown's] reliance upon this email unconvincing.

25. [Brown's] final email to Pfeffer was dated April 29, 201[6] and contained only one line-"I might also suggest keeping

[Bowman] out of the Toxics area and just have him stay in his cubicle. [another employee] and I can handle it[.⁴]"

26. There can be no doubt that [Brown] makes no reference of any kind to misuse of funds in the above email. It is simply a request to Pfeffer to keep Bowman out of the area in which [Brown] was working, presumably because of Bowman's actions noted in [Brown's] earlier two (2) emails. The ALJ finds that [Brown] cannot rely on this email to show that [IDEM] misused public funds.

27. While [Brown] correctly made a report under the [WBL], he failed to show how such report contained a violation of a federal, state or local law, or how [IDEM] was allegedly misusing public funds such that [Brown] should not have been terminated.

28. [Brown] was terminated because his actions of running samples without verifying the valid calibration and on at least two occasions analyzing samples and reporting invalid data as valid did not meet [IDEM's] standards, not because he inadvertently emailed his supervisor about possible federal grant fraud perpetuated by [IDEM]. Therefore, the ALJ finds that there is no causal link between his termination and his attempt at making a whistleblower claim.

29. No other public policy exception has been raised by [Brown], and therefore, the ALJ concludes that SEAC lacks subject matter jurisdiction to hear this Complaint. Thus, [IDEM's] Motion [for Summary Judgment] must be granted.

---

⁴ The alterations in this finding appeared in the original order.

*Id.*, Vol. V at 244-45 (record citations omitted).

Brown subsequently filed another petition for judicial review arguing the SEAC's order granting summary judgment in favor of IDEM was arbitrary and capricious, an abuse of discretion, and unsupported by substantial evidence. Following a hearing on August 19, 2019, the trial court issued an order denying Brown's verified petition for judicial review concluding, in pertinent part:

> [Conclusions of Law]
>
> 12.    [Brown] contends that the law-of-the-case doctrine forecloses many of [IDEM's] arguments, as a result of [the trial court's] previous judicial review decision reversing SEAC's order on IDEM's motion to dismiss. "The law-of-the-case doctrine provides that an appellate court's determination of a legal issue binds both the trial court and the court on appeal in any subsequent appeal involving the same case and substantially the same facts." *Luhnow[ v. Horn]*, 760 N.E.2d [621, 625 (Ind. Ct. App. 2001)]. However, a motion to dismiss and a motion for summary judgment are two different procedural vehicles which address different legal issues. *Id.* at 627. Moreover, SEAC's summary judgment relied on evidence beyond that considered in the motion to dismiss, namely, the e-mails which were the alleged "report" under Indiana's WB[L]. Because SEAC's summary judgment order addresses a different legal issue and different evidence, the law-of-the-case doctrine does not apply here. *Id.* at 627-28.
>
> 13.    Under the federal whistleblower statute, 5 U.S.C. § 2302 (b)(8)-(9), federal courts apply the disinterested observer test to determine whether someone made a "report" of a violation of law. *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)[, *cert. denied*, 528 U.S. 1153 (2000)]. Under this test, a federal

employee has made a "report" if "a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [could] reasonably conclude that the actions of the government evidence [a violation of law]." [*Id.*] "A purely subjective perspective of an employee is not sufficient even if shared by other employees." *Id.*

\* \* \*

16.    Since his termination, [Brown] has alleged that the April 26, 2016 e-mail was a report about IDEM falsely reporting data to the [Environmental Protection Agency ("EPA").] However, a disinterested observer reading the April 26, 2016 e-mail could not reasonably conclude that [Brown] was making a report that IDEM was falsely reporting data to the EPA. [Brown] was complaining only about Bowman's poor workplace performance and was not alleging a violation of law under the WB[L].

17.    [Brown] next alleges that he was wrongly terminated for reporting a misuse of public resources under Indiana's WB[L]. [Brown] relies on the April 26, 2016 e-mail, an April 28, 2016 e-mail, and an April 29, 201[6] e-mail, as evidence of a "report" under Indiana's WB[L].

18.    The Court of Appeals interpreted the phrase, "misuse of public resources" under a similarly worded whistleblower statute, Indiana Code § 22-5-3-3, which is directed to state contractors. *Coutee v. Lafayette Neighborhood Hous. Servs., Inc.*, 792 N.E.2d 907, 914 (Ind. Ct. App. 2003). *Coutee* held that the phrase "misuse of public resources," "contemplates a direct expenditure or use of public funds, property, or resources for a purpose other than that contemplated by the contract in question." [*Id.*] at 914. The phrase "misuse of public resources" should not be so broadly interpreted to apply to "allegations of ineffective management style that might result in increased administrative costs." *Id.*

19.    Indiana Code § 22-5-3-3 is very similar to Indiana Code § 4-15-10-4, which is at issue here.  And the particular phrase being interpreted, "misuse of public resources," is identical to the language in Indiana Code § 4-15-10-4(a)(4), thus *Coutee's* interpretation of "misuse of public resources" is applicable here.

20.    *Coutee* explains that to show a misuse of public resources, the "report" must allege that certain funds were intended for a certain purpose but were subsequently used for another reason. *Coutee*, 792 N.E.2d at 914.  But here, none of the emails show what funds were at issue or how they were used for another purpose.  [Brown's] complaints about Bowman's alleged mismanagement, intentional or not, suggests that there might be increased administrative costs.  But this does not rise to the level required in *Coutee* to support a claim of misuse of public funds.  None of [Brown's] three emails are a report about the misuse of public resources.

21.    Finally, SEAC found that: "[Brown] was terminated because his actions of running samples without verifying the valid calibration and on at least two occasions analyzing samples and reporting invalid data as valid did not meet [IDEM's] standards, not because he inadvertently emailed his supervisor about possible federal grant fraud perpetuated by [IDEM]."

22.    [Brown] alleges that this finding is not supported by substantial evidence and was arbitrary and capricious.

23.    SEAC's' conclusion regarding the reason for [Brown's] termination was based on a finding of fact, paragraph 19, in SEAC's decision, which states:

> [IDEM] felt that [Brown's] actions of running samples without verifying the valid calibration and on at least two occasions analyzing samples and reporting invalid data as

valid did not meet agency standards, so it terminated [Brown] on May 6, 2016, for failure to perform basic tasks and falsifying data.

24. This finding is supported by paragraph 138 of [Brown's] complaint, in which [Brown] state[s] that "his career was summarily terminated based on an allegedly falsification of data and poor work performance," and by [IDEM's] Exhibit A, Brown's termination letter, which was designated as evidence by both parties.

25. "Substantial evidence is more than a scintilla, but something less than a preponderance of the evidence." *State v. Carmel Healthcare Mgmt., Inc.*, 660 N.E.2d 1379, 1384 (Ind. Ct. App. 1996). SEAC's finding was supported by [Brown's] complaint and Brown's termination letter, which is substantial evidence to support SEAC's conclusion of law and was not arbitrary and capricious.

26. Moreover, a party to judicial review must prove harm or prejudice prior to the court finding reversible error. *See Indiana State Bd. Of Embalmers & Funeral Directors v. Kaufman*, 463 N.E.2d 513, 520 (Ind. Ct. App. 1984).

27. [Brown] has not shown that this conclusion of law causes [him] any harm. [Brown] was an at-will employee, and IDEM could terminate him for any reason that is not a violation of law. SEAC properly concluded that IDEM's stated reason for Brown's termination was not a pretext for retaliatory discharge.

[2]8. The decision by SEAC was not arbitrary, capricious, or an abuse of discretion, and the decision was supported by substantial evidence. [Brown] has not shown that SEAC decision warrants reversal under Indiana Code § 4-21.5-5-14(d).

Appealed Order 7-11 (footnote and record citations omitted).  Brown now

appeals.

# Discussion and Decision

## I.  Standard of Review

Brown appeals from the trial court's denial of his petition for judicial review of

the SEAC's decision.  Under the Administrative Orders and Procedures Act, a

court may grant relief only if it determines that a person seeking judicial relief

has been prejudiced by an agency action that is:

> (1) arbitrary, capricious, an abuse of discretion, or otherwise not
> in accordance with law; (2) contrary to constitutional right,
> power, privilege, or immunity; (3) in excess of statutory
> jurisdiction, authority, or limitations, or short of statutory right;
> (4) without observance of procedure required by law; or (5)
> unsupported by substantial evidence.

Ind. Code § 4-21.5-5-14(d).  "A decision is deemed arbitrary and capricious

when it is patently unreasonable and is made without consideration of the facts

and in total disregard of the circumstances [and] lack[s] any basis which might

lead a reasonable person to the same conclusion."  *Ind. Alcohol and Tobacco*

*Comm'n v. Spirited Sales, LLC*, 79 N.E.3d 371, 380 (Ind. 2017) (internal citation

and quotation omitted).  The "burden of demonstrating the invalidity of agency

action is on the party to the judicial review proceeding asserting invalidity."

Ind. Code § 4-21.5-5-14(a).  "Our review of agency action is intentionally

limited, as we recognize an agency has expertise in its field and the public relies

on its authority to govern in that area." *Spirited Sales, LLC*, 79 N.E.3d at 375 (citation omitted). Although we "defer to the agency's findings if they are supported by substantial evidence[,]" we review an agency's conclusions of law de novo. *Moriarity v. Ind. Dep't of Nat. Res.*, 113 N.E.3d 614, 619 (Ind. 2019). "An interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless this interpretation would be inconsistent with the statute itself." *LTV Steel Co. v. Griffin*, 730 N.E.2d 1251, 1257 (Ind. 2000). Moreover, we do not reweigh the evidence; rather, we consider the record in the light most favorable to the agency's decision. *Ind. State Ethics Comm'n v. Sanchez*, 18 N.E.3d 988, 992 (Ind. 2014). We will affirm the agency's judgment unless it is clearly erroneous. *Id.*

## II. Whistleblower Claim

[12] We begin by briefly addressing Brown's employment status at the time of his termination. It is undisputed that, at the time, Brown was an unclassified at-will employee:

> (a) An employee in the unclassified service is an employee at will and serves at the pleasure of the employee's appointing authority.
>
> (b) An employee in the unclassified service may be dismissed, demoted, disciplined, or transferred *for any reason that does not contravene public policy.*

Ind. Code § 4-15-2.2-24 (emphasis added). Here, Brown claims he was terminated in retaliation for his alleged whistleblower claim – a public policy exception to his at-will employment status.

## A. Law-of-the-Case Doctrine

Brown argues the trial court erred in determining that the law-of-the-case doctrine was inapplicable. Brown argued to the trial court that this "doctrine forecloses many of [IDEM's] arguments, as a result of [the trial court's] previous judicial review decision reversing SEAC's order on IDEM's motion to dismiss." Appealed Order at 7, ¶12. We conclude the trial court did not err.

The law-of-the-case doctrine provides that an appellate court's determination of a legal issue binds both the trial court and court on appeal in any subsequent appeal involving the same case and substantially the same facts. *In re Change to Established Water Level of Lake of Woods in Marshall Cty.*, 822 N.E.2d 1032, 1042 (Ind. Ct. App. 2005), *trans. denied*. The doctrine is a discretionary tool with the purpose of minimizing unnecessary repeated litigation of legal issues once they have been resolved by an appellate court. *Think Tank Software Dev. Corp. v. Chester, Inc.*, 30 N.E.3d 738, 744-45 (Ind. Ct. App. 2015), *trans. denied*. To invoke the doctrine, the matters decided in the earlier appeal must clearly appear to be the only possible construction of a decision. *Dutchmen Mfg., Inc. v. Reynolds*, 891 N.E.2d 1074, 1082-83 (Ind. Ct. App. 2008), *trans. denied*. "Thus, questions not conclusively decided in the earlier appeal do not become the law of the case." *Id.* at 1083.

[15] This doctrine is inapplicable to the instant matter for several reasons. First, this doctrine is applicable only when an *appellate* court determines a legal issue, not a trial court. Here, following the SEAC's order granting IDEM's motion to dismiss, Brown filed his first petition for judicial review with the trial court. The trial court reversed the SEAC's decision and remanded for further proceedings. No issues were ever determined by an appellate court such that this doctrine would be applicable.

[16] Second, although the trial court here is acting as a reviewing court to some extent, even if the doctrine were applicable to bind the trial court to its own decision in subsequent phases of litigation, its decision on a motion to dismiss – based solely on the pleadings – cannot bind it on a motion for summary judgment, which has an entirely different standard of review. In a similar case, *Luhnow v. Horn*, the trial court granted a party's motion for judgment on the pleadings, this court reversed and remanded, and the trial court subsequently granted a motion for summary judgment. 760 N.E.2d at 624. On appeal, a panel of this court affirmed the trial court and held that the law-of-the-case doctrine was inapplicable because the standards of review for judgment on the pleadings and summary judgment are different, the appellate court did not consider the merits of a party's complaint in the prior appeal, and the trial court, in granting summary judgment, "look[ed] beyond the pleadings to the designated material[.]" *Id.* at 625-28. We conclude that if the doctrine was not invoked in *Luhnow*, a case very similar to the instant case, the doctrine is inapplicable here where there was no intervening appellate court decision.

And finally, additional evidence was considered by the SEAC, including Brown's e-mails, on remand. Therefore, the trial court's order regarding Brown's first petition, in which it remanded the matter to the SEAC, is not binding on the trial court or this court. The trial court did not err in concluding the law-of-the-case doctrine is not applicable here.

## B. Interpretation of Indiana's Whistleblower Act

Brown argues he was terminated in retaliation for being a whistleblower – a public policy exception to the at-will employment status of an unclassified employee – by reporting IDEM's alleged misuse of public resources and violation of law. Both the SEAC and trial court disagreed and concluded Brown was not reporting the misuse of public resources or a violation of law in his emails to his supervisor. He contends the trial court incorrectly interpreted the WBL for two reasons. First, he claims the trial court was incorrect because he reported *intentional misconduct* by his coworker, not simply ineffective management that resulted in increased administrative costs. And second, he claims the trial court's interpretation is incorrect because the WBL is broader than the government contractor whistleblower statute, Indiana Code section 22-5-3-3, used by the trial court in interpreting the phrase "misuse of public

resources" contained in the state employee's WBL.[5] We review an agency's conclusions of law de novo. *Moriarity*, 113 N.E.3d at 619.

[19] The state employee whistleblower statute at issue in this case, Indiana Code section 4-15-10-4, provides:

> (a) Any employee may report in writing the existence of:
>
>> (1) a violation of a federal law or regulation;
>>
>> (2) a violation of a state law or rule;
>>
>> (3) a violation of an ordinance of a political subdivision (as defined in IC 36-1-2-13); or
>>
>> (4) the misuse of public resources;
>
> to a supervisor or to the inspector general.
>
> (b) For having made a report under subsection (a), the employee making the report may not:
>
>> (1) be dismissed from employment[.]

---

[5] Brown states that the SEAC did not appear to consider whether the WBL would apply to intentional misconduct but instead concluded his complaint involved allegations that his coworker was not doing his job properly without citing caselaw interpreting the government contractor whistleblower statute. *See* Amended Brief of Appellant at 22 n.9. And "to the extent that such an interpretation can be inferred, [Brown contends] it still [is] an improper determination which this Court can review *de novo*." *Id.*

[20] Here, the SEAC concluded that Brown's April 2016 emails constituted a "report" under the WBL but did not contain a report concerning the *misuse of public resources or a violation of law* such that he should not have been terminated. App. of Appellant, Vol. V at 244-45, ¶¶ 23-27. Relying on this court's interpretation of the "misuse of public resources" of the state contractor whistleblower statute in *Coutee*, 792 N.E.2d at 914, the trial court agreed that Brown did not report the misuse of public resources or a violation of law. Appealed Order at 9-10; *see also* Indiana Code § 22-5-3-3.[6] The trial court found that the phrase "misuse of public resources" in the state contractor whistleblower statute is identical to the language at issue here such that *Coutee's* interpretation of the phrase in the state contractor statute is applicable here. *See* Appealed Order at 9, ¶ 19. We agree.

[21] In *Coutee*, an employee was fired by her employer, a private non-profit corporation, after she had expressed her concern about the management and "direction of the organization" to an employee of the non-profit corporation that provided funding to her employer. 792 N.E.2d at 909. The employee sued her employer alleging she had been terminated in retaliation for reporting what she believed to be misuse of public resources, in violation of the state contractor

---

[6] The statute provides, in part: "(a) An employee of a private employer that is under public contract may report in writing the existence of: (1) a violation of a federal law or regulation; (2) a violation of a state law or rule; (3) a violation of an ordinance of a political subdivision (as defined in IC 36-1-2-13); or (4) the misuse of public resources . . . concerning the execution of public contract[.]" In addition, a contractor may not be dismissed from employment for having made such a report. Ind. Code § 22-5-3-3(b)(1).

WBL. *Id.* at 909-10. As a case of first impression, a panel of this court addressed the "misuse of public resources" provision in the statute and held

> that "misuse of public resources" as used in IC 22-5-3-3 contemplates a direct expenditure or use of public funds, property, or resources for a purpose other than that contemplated by the contract in question. Under this construction, "misuse" includes instances where public funds earmarked for a specific purpose by the contract were misspent, whether intentionally or not, for another purpose, whether legitimate or not, and does not necessarily require ethical impropriety[.] For example, misuse would exist if an employee used public funds for personal purposes or applied the funds to a cause or purpose contrary to or beyond the scope of the directive(s) of the contract. Given our construction, we conclude that misuse in the context of IC 22-5-3-3 does not include allegations of ineffective management style that might result in increased administrative costs to the employer due to employee turnover.

*Id.* at 914. Given the identical language of the statutes, we are unpersuaded by Brown's argument that the trial court erred in employing this definition. As such, applying that definition here, we cannot conclude that any of Brown's April 2016 emails contained an allegation of the misuse of public resources.

[22] In his April 26, 2016 email, Brown complained of Russell's poor work performance with respect to two calibration checks. Brown further alleged that the result of Russell's "actions, or lack thereof, was that the complaint analysis was unnecessarily delayed by at least a week[.]" App. of Appellant, Vol. II at 194. Brown characterized Russell's behavior as "willful negligence and deception[,]" which he believed "created unnecessary controversy and

undermined group trust and comradery." *Id.* In Brown's April 28 email, he again outlined an instance concerning Russell's work performance alleging that he failed to use a heat gun to remedy a contamination issue but instead "tried the most elaborate and invasive remedies first[.]" *Id*. at 200. This led Brown to question Russell's education and experience; he speculated that Russell intentionally acted in this manner to "a) satisfy his OCD like urges, b) defy his fellow chemists, and c) deliberately mislead the trainee down a path of inevitable chronic backlog." *Id.* Brown also wrote that "this [was] not the only time [he has] caught Russell giving . . . questionable advice, if not deliberate misinformation. It is distracting, divisive, and it wastes time." *Id.* Finally, in Brown's final email to Pfeffer on April 29, he suggested that Russell stay out of the Air Toxics area and remain in his cubicle because he and another coworker could handle the work. *See id.* at 202.

[23] Brown did not identify any public funds or resources at issue and did not allege the misuse of a direct expenditure, public funds, or public resources. In these emails, Brown detailed only what he believed to be Russell's inadequate work performance and questionable advice and actions, intentional or not, which he believed led to a backlog and wasted time. Nor did Brown allege that Russell or any other IDEM employee "used public funds for personal purposes or applied the funds to a cause or purpose contrary" to IDEM or the State of Indiana. *Coutee*, 792 N.E.2d at 914.

[24] In addition, Brown argued that his emails contained a report of a violation of law: that IDEM was reporting false data to the EPA. In determining whether

Brown reported a violation of law in his emails, the trial court looked to the federal Whistleblower Protection Act ("WPA"), 5 U.S.C. § 2302(b)(8), and the federal courts' interpretation thereof for guidance. Appealed Order at 7-8, ¶ 13. Federal courts apply a disinterested person test to determine whether an employee reported a violation of law: "could a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably conclude that the actions of the government evidence [a violation of law]?" *Lachance*, 174 F.3d at 1381. And "[a] purely subjective perspective of an employee is not sufficient even if shared by other employees." *Id.* We conclude a disinterested observer could not reasonably conclude from Brown's emails that IDEM was violating the law by reporting false data to the EPA.

In sum, Brown never once mentioned public funds or resources; he has not shown how he alleged any violation of law and a disinterested observer could not reasonably conclude IDEM was violating any law based on Brown's emails. As such, Brown did not report the misuse of public resources or a violation of law protected by the WBL. Therefore, the trial court did not err in determining that the SEAC's decision that Brown was not a whistleblower was not arbitrary, capricious, or an abuse of discretion.

## III. Substantial Evidence

Brown also contends the SEAC's decision was not supported by substantial evidence claiming that "there was not a scintilla of evidence" supporting its

decision. Amended Brief of Appellant at 18. Specifically, Brown asserts that the SEAC's finding that his emails were merely complaints about his coworker was "simply . . . an incorrect reading of his emails" and instead, the emails "conclusively demonstrate that [he] was not simply complaining about his co-worker's inability to do his job, but his deliberate conduct contrary to IDEM's directives[, which] falls squarely within the protections afforded" by the WBL. *Id.* at 24-25. We disagree and conclude the SEAC's decision was supported by substantial evidence.

[27] Our standard for reviewing administrative agency decisions is well settled: to determine whether an administrative decision is supported by substantial evidence, a trial court must examine the whole record to determine whether the decision "lacks a reasonably sound basis of evidentiary support." *255 Morris, LLC v. Ind. Alcohol & Tobacco Comm'n*, 93 N.E.3d 1149, 1153 (Ind. Ct. App. 2018). And when reviewing an administrative agency's decision, this court stands in the same position as the trial court. *Id.*

> [We] may not substitute [our] judgment on factual matters for that of the agency and [are] bound by the agency's findings of fact if [the findings] are supported by substantial evidence. [We] review the record in the light most favorable to the administrative proceedings and are prohibited from reweighing the evidence or judging the credibility of witnesses.

*Id.* (quotation and internal citation omitted).

[28] Substantial evidence is defined as "more than speculation and conjecture yet less than a preponderance of evidence. Substantial evidence means such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Mills*, 76 N.E.3d 861, 870 (Ind. Ct. App. 2017), *trans. denied*. Here, IDEM's May 6 termination letter to Brown stated that "[o]n at least two occasions, you analyzed samples and reported invalid data as valid. Your failure to perform the basic task of checking the calibration does not meet performance standards and reporting false data is considered a dishonest act. Both actions are unacceptable, do not meet agency standards, and are the reason[s] for this disciplinary action." App. of Appellant, Vol. II at 42. Furthermore, the SEAC found that Brown's emails did not contain a report of misuse of public resources or a violation of law.

[29] We conclude that IDEM's termination letter to Brown and Brown's emails support the SEAC's finding that Brown's emails were merely complaints about his coworker and its conclusion that Brown was not a whistleblower. Brown's argument to the contrary amounts to an invitation for us to reweigh the evidence in his favor, which we cannot do. *255 Morris, LLC*, 93 N.E.3d at 1153. Therefore, the trial court did not err in concluding the SEAC's decision was supported by substantial evidence.[7]

---

[7] Brown also takes issue with the SEAC's conclusion that there was no causal link between his termination and his whistleblower claim. Specifically, Brown argues that the SEAC's causation determination was arbitrary, capricious, and an abuse of discretion because the SEAC did not call for the submission of any evidence and therefore, he did not present "all material pertinent to [the summary judgment motion] because IDEM had stated they were not arguing for Summary Judgment based on causation"; the determination violated his due process rights because the SEAC did not make a finding but merely recited what IDEM "felt" and it failed to provide a reason for disregarding his evidence; and the determination was not supported by substantial evidence. Amended Br. of Appellant at 14-17. In addition, Brown argued that the SEAC's

[30]  In sum, we cannot conclude the SEAC's decision was arbitrary, capricious, an abuse of discretion, or unsupported by substantial evidence. Therefore, the trial court did not err in denying Brown's petition for judicial review.

# Conclusion

[31]  For the reasons set forth above, we conclude the trial court did not err in concluding the SEAC's decision that Brown was not a whistleblower was not arbitrary, capricious, or an abuse of discretion or in concluding the SEAC's decision was supported by substantial evidence. Accordingly, the judgment of the trial court is affirmed.

[32]  Affirmed.

Bradford, C.J., and Altice, J., concur.

---

findings of fact were unreasonable and the agency "reached its conclusion without any analysis of [his] evidence, which specifically explained why he had not done what IDEM alleged" in his termination letter. *Id.* at 20. Because we agree that Brown's reports were not protected by the WBL and he therefore failed to establish a public policy exception to his at-will employment status, our analysis ends there. As an unclassified at-will employee, IDEM could terminate Brown for any reason that does not contravene public policy and because he failed to establish such public policy, Ind. Code § 4-15-2.2-24(b), the question of whether there was a causal link between his report and termination, IDEM's stated reason for his termination, and any findings thereon, are irrelevant and do not harm Brown because he is not a whistleblower. Accordingly, we need not address Brown's arguments on appeal pertaining to this issue.